Riggs v. Christie.

RICHARD W. RIGGS & another *vs.* JAMES D. CHRISTIE.

Middlesex. February 7, 1961. — April 6, 1961.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Negligence,* Doctor.

Evidence did not warrant a finding of negligence on the part of a doctor toward a boy patient in that after the boy, suffering from chicken pox, had been discharged from a hospital following an apparently successful appendectomy the doctor, although informed by the boy's parents of high temperature, pain and other symptoms and requested by them to visit the boy later on the day of the discharge and on the next day, did not make a visit until he was called again by the boy's mother on the second day after the discharge, when he examined the boy and had him removed to a hospital where a diagnosis of peritonitis was ultimately made.

TORT. Writ in the Superior Court dated February 14, 1955.

The action was tried before *Vallely,* J.

*Edward M. Swartz,* for the plaintiffs.

*David W. Kelley,* for the defendant.

KIRK, J. The plaintiff Richard W. Riggs, a minor (hereinafter called the plaintiff), seeks damages from the defendant, a general practitioner of medicine in Littleton, for physical harm allegedly suffered because of a delay in getting a diagnosis of the plaintiff's condition following an appendectomy. The plaintiff's mother seeks consequential damages. The jury returned verdicts for the plaintiffs. The judge reserved leave to set the verdicts aside, and later upon motion did so, and entered verdicts for the de-

fendant. The propriety of the judge's action in this respect is the only question before us. In determining the question we apply the familiar rule that the plaintiff is entitled to have the evidence considered in its aspect most favorable to him from whatever source it comes. *Interstate Busses Corp.* v. *McKenna,* 329 Mass. 1, 2.

The defendant, a licensed physician, had been engaged in the general practice of medicine in the town of Littleton since 1910. He had treated the plaintiff and his mother before. There were other doctors in the town. On May 17, 1954, the plaintiff, an only child and then eleven years old, was taken by his mother to the defendant's office. He complained of severe abdominal pains. The defendant said that there "may be a questionable appendicitis, but he rather thought it was a virus." He prescribed pills, and instructed the mother to bring the plaintiff back if the pain continued. She brought the plaintiff back the next day. The pains were worse. The defendant stated it was not a virus and arranged for a blood count at the Emerson Hospital in Concord where it was determined that the plaintiff had appendicitis. The defendant then had Dr. Chandler, a surgeon from Clinton, examine the plaintiff at the Community Hospital in Ayer. The surgeon said that the most likely diagnosis at the time was acute appendicitis and he recommended immediate surgery. The operation was performed that day, May 18, 1954. The defendant assisted at the operation. The appendix was acutely inflamed at the tip, and the case was unusual in that the tip adhered to the ileum and had to be separated from it. On May 19, 1954, the plaintiff broke out with chicken pox, and strict contagion technique was thereafter observed. On Saturday, May 22, 1954, at 11 A.M. the plaintiff left the hospital. When the plaintiff's mother took him home, the defendant was not at the hospital but he had seen the plaintiff earlier in the morning. At home, the plaintiff had pain, was very weak, and perspired freely. The chicken pox was still active. He was put to bed. His temperature at 2 P.M. was 101°. In the afternoon, the mother called the defendant at

Riggs *v.* Christie.

his office and "described . . . [the plaintiff's] condition to
him." The defendant did not feel it was necessary to visit
the plaintiff. He told the mother that the pain was gas
pain, that the temperature was due to excitement, and that
he would have pills for the gas pains if she would pick
them up at his office, which she did.

At ten o'clock Sunday morning, May 23, 1954, the plain-
tiff's father called the defendant and "explained . . . [the
plaintiff's] condition to" him. The pain was worse, the
abdomen was very tender, the temperature was 102°, his
face was distorted with pain, he was perspiring, his legs
were drawn up, and he had abdominal pains. The father
asked the defendant to come and see the plaintiff. The
defendant told the father that he thought the boy had
picked up a virus, that the mother was acting as the typi-
cal mother of an only child, and that there was nothing the
matter with the plaintiff so far as the appendectomy was
concerned. The father went to the defendant's office and
got some pills.

On Monday, May 24, 1954, at 7:15 A.M. the mother tele-
phoned to the defendant and informed him that on Sunday
afternoon the plaintiff had "terrific pain," had diarrhea
which lasted well into the night, had vomited the pills sup-
plied by the defendant, had fallen asleep of exhaustion at
2 A.M. Monday, and had awakened at 6:15 A.M. in "terrific
pain."

The defendant arrived at the plaintiff's house at 10 A.M.,
examined the plaintiff, took his temperature which was
105°, felt his abdomen, and decided that a surgeon should
see him. "The defendant stated that Dr. Chandler was
away, that he would contact Dr. Randolph Piper in Concord
and have him see Richard. At about 3:15 P.M. Dr. Christie
called and told her [the mother] that Dr. Piper said it was
a hospital case." The defendant made arrangements for
the admission of the plaintiff to the Children's Hospital.
The plaintiff and his mother arrived at 4:30 P.M., and he
was placed in isolation because he still had chicken pox.

The Children's Hospital record contains the notation

that upon admission the plaintiff's temperature was 100.6°. It also states that following X-ray and examination "The appearance [of the X-ray], in conjunction with the history, is very suggestive of peritoneal inflammatory reaction."

The medical testimony, in substance, was as follows: Peritonitis is an inflammation of the membrane which lines the abdominal cavity and covers all the internal organs. There are several causes of peritonitis. It may be caused by chemical irritation. More commonly it is secondary to bacterial infection. No matter how carefully an operation may be performed, and in spite of all that can be done medically, there is no guaranty that peritonitis will not follow. Following an appendix operation, the first two or three days are the ones to worry about most. It is possible but less likely that it could develop within four or five days. The symptoms of peritonitis are many and varied. Common symptoms are abdominal pains, fever, vomiting, diarrhea, and doubling up of legs. Such symptoms are indicative of many other troubles and diseases besides peritonitis. There is no routine treatment for peritonitis. It is an individual thing. The sooner it is detected and treatment commenced, the better. It is fair to state that the plaintiff did not have peritonitis when he was discharged from the hospital following his appendectomy. When "the appendix was excised, . . . [the surgeon] had removed the only part of the abdominal content that in any way involved a condition of peritonitis." But the plaintiff still had chicken pox which lowers resistance to infection to some extent. Because of his rash it was impossible to remove him to another general hospital.

In accordance with the principles which have been developed in this Commonwealth in malpractice cases, it is clear that there can be no recovery, and that the judge was right in entering verdicts for the defendant. The duty owed by a physician to his patient has been frequently stated, reaffirming the rule first enunciated in *Small* v. *Howard,* 128 Mass. 131, 133, 135, which in substance is: the undertaking of a physician as implied by law is that he possesses and

will use the reasonable degree of learning, skill and experience which is ordinarily possessed by others of his profession in the community where he practises, having regard to the current state of advance of the profession (*Semerjian* v. *Stetson,* 284 Mass. 510, 512–513; *Tallon* v. *Spellman,* 302 Mass. 179, 182–183, and cases cited); and that he will in cases of doubt use his best judgment as to the treatment to be given in order to produce a good result. He does not warrant a cure.

From no source was there the slightest suggestion that the defendant was wanting in the requisite degree of training and experience. Similarly there was no evidence that the treatment which the defendant gave to the plaintiff was not in accordance with good professional practice. When the defendant first examined the plaintiff on May 17, 1954, he made tentative alternative diagnoses. The following day, he eliminated one alternative and took appropriate steps to confirm the other. When confirmed, he selected a qualified surgeon to perform the operation, at which the defendant assisted, and which was apparently successful. Four days later, when the period during which peritonitis is likely to develop had passed, and when there were no signs of peritonitis, he attended the plaintiff and authorized his discharge from the hospital.

The gravamen of the plaintiff's case seems to stem from the fact that the defendant did not visit the plaintiff on the afternoon of the day of his discharge when requested to do so by the mother, and that he did not visit him the next day, Sunday, when requested by the father. This to us seems to be a question of professional judgment to be exercised by the defendant in the light of the medical facts already known to him and the symptoms reported to him about the case; and in the light of his knowledge of the personalities involved and his obligations to other patients. The symptoms reported were not especially peculiar to peritonitis. It does not appear from the evidence that the defendant or any other physician would, at either time, have made a definitive diagnosis of peritonitis if the plaintiff had been

seen.   Nor does it appear that, if a diagnosis of peritonitis had then been made, the course of the plaintiff's illness would have been other than that which in fact developed. The surgeon who was a consultant to the defendant on Monday morning recommended hospitalization.   It is not disclosed that he made a diagnosis.   At the hospital the diagnosis of peritonitis was not immediately made.

In the usual case where matters of professional judgment are involved, a tribunal of fact, whether court or jury, unassisted by expert testimony or evidence from the profession concerned, should not retrospectively substitute its judgment for that of the person whose judgment had been sought and given.   Although there was extensive testimony from experts at the trial, none of it indicated that the defendant had acted improperly.   See *Bouffard* v. *Canby,* 292 Mass. 305, 309; *Tallon* v. *Spellman,* 302 Mass. 179, 183, and cases cited; and cf. *Thomas* v. *Ellis,* 329 Mass. 93, 97. There are exceptional cases where a court or jury without expert assistance may find a breach of the physician-patient relationship (*Toy* v. *Mackintosh,* 222 Mass. 430, *Ernen* v. *Crofwell,* 272 Mass. 172; see *Marangian* v. *Apelian,* 286 Mass. 429, 436), but this is not such a case.

*Exceptions overruled.*