ROBERT M. DELANEY *vs.* CHARLES E. ROSENTHALL.

Middlesex.   December 4, 1963. — March 4, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Negligence,* Doctor.

Even without expert medical opinion in an action against a physician,
a finding that he was negligent in his treatment of the plaintiff was
warranted by evidence that the plaintiff lacerated his thumb so badly
that the defendant had to take many stitches in it, that the plaintiff
returned for treatment to the defendant's office on sixteen different
occasions within five weeks after the accident, during which there were
pain and increasing swelling of the thumb, that on twelve of the plain-
tiff's office visits the defendant left treatment of him to a girl "as-
sistant," a high school graduate with only two years experience as a
hospital nurses' aide, that the defendant failed to prescribe hospitaliza-
tion even after it was clear that the plaintiff's thumb was infected and
once stated that hospitalization "would cost . . . [the plaintiff's em-
ployer] more," and that, shortly after the plaintiff's last visit to the
defendant's office, when the defendant first took an X-ray of the plain-
tiff's thumb, the plaintiff was hospitalized on the advice of another
physician and a beneficial treatment followed for a condition diagnosed
as osteomyelitis.

TORT.   Writ in the Superior Court dated December 8,
1959.

The action was tried before *Kalus, J.*

*Thomas B. Shea* for the plaintiff.

*David W. Kelley* for the defendant.

SPIEGEL, J.   In this action of tort for malpractice the
defendant rested at the close of the plaintiff's case and the
judge directed a verdict for the defendant.   The case comes
here on the plaintiff's exceptions to this and other rulings.

We summarize the evidence as follows: The plaintiff
worked for the Colonial Engineering Company (Colonial)
as a fabricator of sheet metal.   On November 17, 1958, the
rotating disk of an electric sander with which he was work-
ing "snagged . . . and flew off into his left hand," causing

serious lacerations and profuse bleeding. The vice-president of the company applied a bandage, and one of the mechanics in the shop took him to the office of the defendant, a physician practising in Somerville. The defendant bathed the hand and injected ''shots'' of penicillin and antitetanus and a third which the plaintiff ''did not know.'' The defendant stitched up the lacerations with thirty-seven stitches, bandaged the hand, and prescribed medication for relief of pain. The defendant asked the plaintiff whether he wished to continue to be treated by him or by another physician, and the plaintiff stated that he would continue treatments with the defendant. The plaintiff, as directed by the defendant, returned to the defendant's office November 19, two days later. On this occasion he did not see the defendant, but was treated by a woman in a white uniform named Phyllis, who worked for the defendant as an ''assistant.'' Phyllis, a high school graduate, had previously worked as an aide for two years in a hospital. Phyllis removed the bandage, looked at the hand, soaked, bathed, and rebandaged it, and instructed the plaintiff to return on Friday, November 21. He did so and was treated by the defendant. The thumb was swollen to twice its normal size and the flesh was swelling around the stitches, which ''were starting to disappear in the flesh.'' The doctor removed some of the stitches and ''squeezed'' the thumb. Pus was starting to come out of the cuts where they had been stitched. When the defendant pressed the thumb the plaintiff ''felt a tremendous pain.'' Phyllis applied the bandage and the defendant told the plaintiff to soak the hand and ''to keep the bandage continually wet.'' Pills were prescribed but after a few days these did not relieve the pain as effectively as at first. Three or four days later the plaintiff returned to the defendant's office and Phyllis gave him a shot of penicillin and bathed and soaked the hand.

On November 28 the plaintiff went to the defendant's office but did not see the defendant. Phyllis took out the remaining stitches and pressed the thumb as the doctor had done.

Delaney *v.* Rosenthall.

Around December 1 the plaintiff was seen by the defendant at his office. The thumb was now three times its normal size and he could not move it at all. The surface of the thumb was hard and it had turned a "reddish, brownish color." When the defendant pressed the thumb the plaintiff "thought he was going to collapse from the pain."

On the second or third visit after December 1 the plaintiff was seen by the defendant. The swelling of the thumb was increasing. The plaintiff asked the defendant if an X-ray would do any good and the defendant told him that it would not. However, on December 22 an X-ray was taken of the plaintiff's hand at the defendant's office. This was the first time that an X-ray had been taken by the defendant. The plaintiff, between the first visit on November 17 and the last on December 22, went to the defendant's office seventeen times but on no more than five of these visits was he seen by the defendant.

On December 26 the plaintiff consulted Dr. John Fagan, a surgeon practising in Cambridge. On Dr. Fagan's advice the plaintiff went to the Cambridge City Hospital on the following morning. There X-rays were taken of his thumb and drains were inserted. This treatment produced beneficial results, for the pain was "immediately relieved and he [the plaintiff] was able to sleep for the first time." He remained in the hospital thirty days and when he was discharged his thumb had become normal in size and the swelling had gone, but he could not flex it.

Subsequently, the plaintiff reëntered the hospital and came under the care of an orthopedic surgeon and underwent further operations to his hand. One of these involved a bone graft in the thumb. The plaintiff's condition which made these operations necessary was diagnosed as osteomyelitis. This had caused a portion of the bone in the thumb to become dead, and it became necessary to remove the dead bone in order to avoid amputation of the thumb. The condition of the thumb gradually improved and the plaintiff was discharged. "His thumb was half an inch shorter and it was stiff and it had no joints." The plaintiff was unable to resume work until the following December.

Dr. Fagan testified at the trial that the treatment which he prescribed after the plaintiff came under his care was "the most conservative course of treatment." There was no expert medical opinion that the defendant was negligent in his treatment of the plaintiff. The defendant's answers to the plaintiff's interrogatories indicate that the defendant thought hospitalization of the plaintiff to be desirable.[1] The plaintiff testified that the defendant "never told me to go into the hospital" and that on one occasion, when specifically asked about alternative courses of treatment, the defendant told the plaintiff that cutting and draining the thumb would require hospitalization and would be "too painful." On another occasion, in the course of treatment, Phyllis said to the defendant that Colonial's plant manager had been inquiring when the plaintiff would be able to return to work. The defendant became angry and said to her, "I could put this man in the hospital and it would cost them more money."

The main issue before us is whether the trial judge was in error in directing a verdict for the defendant. The duty owed by a physician to his patient has been stated frequently. This court has recently said: "[T]he undertaking of a physician as implied by law is that he possesses and will use the reasonable degree of learning, skill and experience which is ordinarily possessed by others of his profession in the community where he practises, having regard to the current state of advance of the profession . . . and that he will in cases of doubt use his best judgment as to the treatment to be given in order to produce a good result. He does not warrant a cure." *Riggs* v. *Christie,* 342 Mass. 402, 405–406.

---

[1] Q. "If . . . you rendered . . . [treatment] to this plaintiff, please state . . . [a]ny recommendations to the plaintiff as to self-treatment, other medical attention, or any suggestions or instructions, and the dates thereof." A. "On . . . 11–21–58, [t]he plaintiff was asked to submit to hospitalization but he refused. . . . He would have been admitted to a hospital of his choice. . . . 11–25–58, [i]t appeared that the infection had progressed on the thumb. I again recommended hospitalization. Hospitalization was recommended on practically every visit. 12–19–58, [h]ospitalization strongly urged because of the infection. . . ."

From the conflict between what the defendant said in answers to the plaintiff's interrogatories and the advice which the plaintiff testified he was given, together with his testimony as to the defendant's comment concerning the cost to Colonial involved in hospitalization of the plaintiff, the jury would be warranted in finding that the defendant did not "use his best judgment . . . in order to produce a good result." In the instant case there was evidence from which the jury could also find the following: (1) That the defendant failed to prescribe hospitalization even after it was clear that the plaintiff's thumb was infected. (2) That he left the treatment of the plaintiff largely to Phyllis, whose medical training and experience were almost nonexistent. The accident happened on November 17, 1958, at which time the plaintiff had a severely injured thumb which required thirty-seven stitches. The plaintiff returned for treatment on sixteen different occasions. The condition of the thumb became worse. A girl who had merely graduated from high school and had worked in a hospital as a nurses' aide for about two years was permitted by the defendant to treat the plaintiff on at least twelve out of seventeen visits. She removed stitches, squeezed pus out of his thumb, prescribed pills, injected penicillin, removed bandages and reapplied bandages to his hand, and even advised the plaintiff as to the treatment to be followed. Applying the standard of *Riggs* v. *Christie, supra,* we believe that the jury would be warranted in finding, without the aid of expert opinion, that the defendant's treatment of the plaintiff was not consistent with "the reasonable degree of learning, skill and experience which is ordinarily possessed by others of his profession in the community where he practises." See *Berardi* v. *Menicks,* 340 Mass. 396, 400.

In view of this holding, it becomes unnecessary to consider the other questions argued by the plaintiff as they are not likely to arise on a retrial of the case.

*Exceptions sustained.*