SALEM ORTHOPEDIC SURGEONS, INC. *vs.* WILLIAM F.
QUINN & another.[1]

Essex. January 3, 1979. — March 14, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, & WILKINS, JJ.

*Doctor. Contract,* With doctor. *Medical Malpractice,* Tribunal.

An action or counterclaim alleging breach by a physician or other
    health care provider of an express promise to produce a specific
    medical result is subject to the screening provisions of G. L. c. 231,
    § 60B. [516-521]

CIVIL ACTION commenced in the First District Court of
Essex on May 14, 1977.

After removal to the Superior Court, the case was re-
ported to the Appeals Court by *Banks,* J., a District Court
judge sitting under statutory authority. The Supreme
Judicial Court granted a request for direct review.

*Stephen A. Moore (Jean F. Farrington* with him) for the
plaintiff.

*William F. Quinn, Jr.,* for the defendants.

QUIRICO, J. This case requires us once again to consider
the scope of the medical malpractice tribunal statute,
G. L. c. 231, §§ 60B-60E, inserted by St. 1975, c. 362, § 5.
Salem Orthopedic Surgeons, Inc. (Salem Orthopedic),
brought suit against William F. Quinn (Quinn) to recover
more than $3,000 in unpaid medical bills on account of
services rendered by Richard E. Conway, M.D. (Dr. Con-

---

[1] Patricia A. Quinn, daughter of William F. Quinn, was added as a
plaintiff in counterclaim following the commencement of this action.
See Mass. R. Civ. P. 13(h), 365 Mass. 758 (1974); *id.* 20(a), 365 Mass. 766
(1974). Because the legal questions raised by Patricia's counterclaim
are, despite differences in the damages requested, identical to those
raised by Quinn's, we make no further mention of it in this opinion.

way), a professional employee of Salem Orthopedic, to Quinn's daughter Patricia. Quinn defended and filed a counterclaim on the basis of the alleged breach by Dr. Conway of a promise to produce a specific medical result. Salem Orthopedic moved for an order referring the case to a malpractice screening tribunal pursuant to G. L. c. 231, § 60B. The judge denied this motion and reported the question of law whether this statute applied to Quinn's counterclaim. See Mass. R. Civ. P. 64, 365 Mass. 831 (1974). We granted Salem Orthopedic's petition for direct appellate review. See Mass. R.A.P. 11(a), 365 Mass. 854 (1974). It is our opinion that Quinn's contractual counterclaim is subject to the statute and that it should initially be screened by a malpractice tribunal. We therefore answer the reported question in the affirmative.

We summarize the facts stated in the pleadings and in the answers of the parties to interrogatories, treating uncontradicted statements as true and resolving conflicts in favor of Quinn. In an automobile accident on October 4, 1974, Patricia suffered severe injuries including various lacerations, a cerebral concussion, a ruptured spleen, and a compound fracture of the femur. She was cared for at the North Shore Children's Hospital in Salem by Dr. Conway between that day and December 21, 1974. Dr. Conway operated on Patricia's left thigh and knee on October 21, 1974, in order to repair the fracture of the femur. Owing to extensive comminution of the fracture and ensuing difficulty in seating a metal plate securely, this operation left Patricia's leg noticeably crooked and shorter than her other leg.

On May 14, 1975, Dr. Conway performed a second operation (1975 operation) on Patricia's leg for the purpose of straightening and lengthening it. He originally intended to straighten the bone and fix it with a blade plate. During the course of the operation, however, he determined the bone tissue to be too soft to anchor such a plate. He therefore used a number of pins in conjunction with a bone graft, achieving some, but not complete, improvement in the condition of Patricia's leg.

Surgeons other than Dr. Conway performed two other operations on Patricia during 1976 and 1977 aimed at further improving her leg. Neither was completely successful. At the time this action was brought in June of 1977, some deformity and lateral instability of the knee persisted.

Quinn alleged that he had a conversation with Dr. Conway sometime in December of 1974, the import of which was that Dr. Conway agreed to perform the 1975 operation and stated that it would straighten and lengthen Patricia's leg. Quinn predicates his counterclaim on this statement, which he characterizes as an express promise by Dr. Conway to achieve a particular result. Although Dr. Conway describes his statements as being greatly more equivocal with regard to the likely result of the surgery, we need not resolve this factual dispute to decide the reported question of law. We will, therefore, treat Quinn's characterization as accurate.

The foundation for Quinn's contractual counterclaim was probably laid by our decision in *Sullivan* v. *O'Connor*, 363 Mass. 579 (1973). Prior Massachusetts law had recognized a right of action "in tort" to recover for malpractice or "in contract" to recover for breach of a physician's implied promise not to commit malpractice. See, e.g., *Riggs* v. *Christie*, 342 Mass. 402, 405-406 (1961); *Capucci* v. *Barone*, 266 Mass. 578, 581 (1929); *Small* v. *Howard*, 128 Mass. 131, 135 (1880), overruled on other grounds by *Brune* v. *Belinkoff*, 354 Mass. 102, 108 (1968). See also Miller, The Contractual Liability of Physicians and Surgeons, 1953 Wash. U. L.Q. 413, 413-416 (tracing development of tort concept of malpractice from implied contractual obligations); Restatement (Second) of Torts § 299A, Comment c (1965) (equating tort duty of physician to implied understanding). Legislative enactments juxtaposing the phrase "tort or contract" with the phrase "malpractice, error or mistake" recognized the similarity of these two theories of recovery. See G. L. c. 231, § 59C, as amended through St. 1960, c. 69; G. L. c. 233, § 79C; G. L.

c. 260, § 4. In *Sullivan*, however, we followed the lead of those other States which allowed recovery against a physician who expressly agrees to produce a certain medical result and then, without fault, fails to do so. 363 Mass. at 581-583. See generally, Annot., 43 A.L.R.3d 1221 (1972) (collecting cases). The remedy authorized by *Sullivan* may include compensation for the detriment, including pain and suffering, needlessly incurred in reliance on the physician's promise and for any worsening of condition resuting from the abortive treatment. 363 Mass. at 586-588.

The present controversy involves harmonizing *Sullivan* with G. L. c. 231, § 60B, which was enacted in 1975 as part of a comprehensive legislative package for averting a crisis in medical malpractice insurance within the Commonwealth. See St. 1975, c. 362, Preamble (emergency declaration). That section provides in relevant part that "[e]very action for malpractice, error or mistake against a provider of health care shall be heard by a tribunal consisting of ... [a judge, a physician, and an attorney], ... at which hearing the plaintiff shall present an offer of proof and said tribunal shall determine if the evidence presented if properly substantiated is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result." It further provides that a plaintiff may proceed after an adverse tribunal ruling only on filing a $2,000 bond secured by cash or its equivalent to indemnify the defendant for costs, witness and expert fees, and attorney fees in case the defendant prevails at trial.[2]

The narrow question before us is whether an action for breach of contract to produce a medical result is one for "malpractice, error or mistake" within the meaning of

---

[2] We upheld the screening and bonding requirements against a variety of constitutional attacks in *Paro* v. *Longwood Hosp.*, 373 Mass. 645 (1977), and no constitutional question is presently before us.

§ 60B. We reserved decision of this question in *Austin* v. *Boston Univ. Hosp.*, 372 Mass. 654, 655 n.4 (1977). For reasons we shall explain, we now conclude that the answer is "yes."

The legislative history of § 60B offers essentially no guidance, suggesting that the Legislature acting in 1975 did not specifically consider the impact of *Sullivan* on its scheme for controlling malpractice insurance costs. The bill originally filed and the redrafted bill reported out of committee both required screening of "[e]very action of tort or breach of contract for malpractice, error or mistake ...." 1975 House Doc. No. 5978, § 6, § 60B. 1975 House Doc. No. 6196, § 6, § 60B. On the suggestion of the House Committee on Bills in the Third Reading, the Legislature later substituted a bill lacking the words "of tort or breach of contract." See 1975 House Doc. No. 6315, § 5, § 60B; 1975 House Journal 2144 (June 10, 1975). This altered language was ultimately enacted. See St. 1975, c. 362, § 5, § 60B.

Although several inferences are possible from the sequence we have stated, the elimination of the express mention of tort and contract actions was probably aimed at conforming the bill to the newly effective Massachusetts Rules of Civil Procedure, under which there is only one form of civil action. The references to contract actions which remained in the enacted bill (see G. L. c. 231, § 60B, third par.; *id.* § 60D) were probably overlooked. Thus, the wording of the tribunal statutes is inconclusive of the question now before us.[3]

---

[3] Other inconclusive indications of legislative intent include the following. The act adding § 60B also created a joint underwriting association (JUA) to provide malpractice coverage during the crisis period. St. 1975, c. 362, § 6. The JUA provisions envisioned insurance against claims arising from "negligence or malpractice." *Id.* In addition, the act empowered a special commission to study the problem of malpractice insurance within the Commonwealth and to make recommendations about solutions thereto. *Id.* § 12. See also St. 1977, c. 474 (extending life of commission to December 31, 1979). The commission evidently conceived its role as limited to investigating *negligent* mal-

Previous decisions by this court also furnish no guidance. We recently considered the question whether a patient's action under G. L. c. 93A, § 9, alleging that a nursing home committed an unfair or deceptive trade practice by rendering negligent care, was appropriate for tribunal screening. See *Little* v. *Rosenthal*, 376 Mass. 573 (1978). In that case, we voiced our belief that "all treatment-related claims were meant to be referred to a malpractice tribunal." *Id.* at 576. Reasoning that the plaintiff in *Little* relied on the same factual allegations to support her claim under c. 93A and her claim of malpractice, we concluded that both claims were "treatment related" and properly considered by a § 60B tribunal. *Id.* at 577.

*Little* is helpful but not decisive in our disposition of the present case. In theory, an action under *Sullivan* embraces only the issues (1) whether the physician made an absolute promise, (2) whether he failed to perform the obligation thus assumed, and (3) what damages are traceable to such breach of his contract. Also in theory, it would be irrelevant whether the physician conformed to the appropriate standard of medical care, for his liability on such an action may exist independently of fault. The action is not, therefore, "treatment related" in the sense of *Little* because it raises factual issues different from those involved in the usual malpractice action based on negligence. Cf. *Scandura* v. *Trombly Motor Coach Serv., Inc.*, 370 Mass. 612, 618 (1976) (liability under implied contract to use due care no broader than tort liability); *Forman* v. *Wolfson*, 327 Mass. 341, 343 (1951) (action on implied promise to use due care barred by judgment in earlier tort malpractice action).

The dissimilarity between an ordinary malpractice action and one based on *Sullivan*, however, may not become apparent until a late stage in judicial proceedings. That is, because the existence or nonexistence of an express

practice. See Interim Report, 1976 House Doc. No. 4380, at 4 (defining malpractice as "improper treatment or culpable neglect").

and absolute undertaking will usually be a question of fact, it may be impossible for a trial judge to separate true *Sullivan*-type claims from claims involving at most breach of the tort-based duty of care before the case is on trial.[4] Thus, a frivolous action alleging breach of contract may have considerable nuisance value, and the bringing of such an action may well induce settlement or defense costs all out of proportion to its merits.

We noted in *Sullivan* that "[c]onsidering the uncertainties of medical science and the variations in the physical and psychological conditions of individual patients, doctors can seldom in good faith promise specific results. Therefore it is unlikely that physicians of even average integrity will in fact make such promises. Statements of opinion by the physician with some optimistic coloring are a different thing, and may indeed have therapeutic value. But patients may transform such statements into firm promises in their own minds, especially when they have been disappointed in the event, and testify in that sense to sympathetic juries." 363 Mass. at 582. These observations suggest a further reason why actions nominally alleging breach of express contract should be routinely screened pursuant to § 60B. If physicians are unlikely to promise specific results, the great bulk of cases so alleging will actually turn on the ordinary question of negligent treatment. These cases must, therefore, be subject to tribunal screening in order to implement the legislative purpose of discouraging "frivolous claims whose defense would tend to increase premium charges for medical malpractice insurance." *Austin* v. *Boston Univ. Hosp.*, 372 Mass. 654, 655 n.4 (1977). Moreover, the insight gained through participation in the screening process may alter a patient's perception of his doctor's lan-

---

[4] *Sullivan*-type actions may often survive beyond the summary-judgment stage when, as is apt to be typical, they turn primarily on credibility. See 10 C. A. Wright & A. R. Miller, Federal Practice and Procedure § 2727, at 535-536 & n.81 (1973) (summary judgment inappropriate when credibility of movant's evidence at issue).

guage and thereby induce voluntary discontinuance of meritless actions.

One additional problem requires attention. The parties have apparently assumed that, if Quinn's claim were referred to a tribunal, the tribunal would consider the evidence bearing on whether Dr. Conway made an express contract. The statutory function of the tribunal is, however, to separate malpractice claims into two classes: those appropriate for judicial evaluation and those involving merely an unfortunate medical result. G. L. c. 231, § 60B, first par. In performing this function, the tribunal may examine predominately medical evidence. *Id.* fifth par. The medical focus of a § 60B tribunal is further emphasized by the requirement that one member be a physician or, when the defendant is not himself a physician, a representative of the defendant's field of health care providers. *Id.* third par. All of these factors are strongly indicative of a legislative intention that a tribunal should evaluate only the medical aspects of a malpractice claim for the purpose of distinguishing between cases of tortious malpractice and those involving "merely an unfortunate medical result."

Thus, the question whether the parties made the agreement as alleged in the counterclaim is beyond the competence of a screening tribunal. However, because the Quinns' claim is based exclusively on an express contract, the question for decision by the tribunal is whether the evidence presented in the offer of proof "is sufficient to raise a legitimate question ... appropriate for judicial inquiry" (*id.* first par.) on the issue whether the medical result obtained is consistent with the medical result allegedly promised by the health care provider. Such screening is also necessary as a matter of administrative convenience to deal with those cases that superficially seem to involve, but may not in fact involve, express promises.

For the reasons stated, we answer the reported question in the affirmative. An action or counterclaim alleg-

ing breach by a physician or other health care provider of an express promise to produce a specific medical result is subject to the screening provisions of G. L. c. 231, § 60B. The case is remanded to the Superior Court for further proceedings consistent with our answer to the question reported. If the tribunal concludes that the medical result achieved by Dr. Conway is consistent with the promise which he allegedly made, the Quinns may thereafter pursue their counterclaim through the usual judicial process only on filing a bond in the form and amount prescribed by the statute.

*So ordered.*