Krupp, Peter B., J.
Plaintiffs Steven and Patricia Medeiros allege that Neil Ewing (“Ewing”), a physician assistant, negligently managed Mr. Medeiros’s antico-agulation during his perioperative visits to the Cambridge and/or Somerville Hospitals around the time of his right knee disarticulation surgery in August 2009. In 2009, the Cambridge Public Health Commission owned Cambridge and Somerville Hospitals, which operated as Cambridge Health Alliance (“CHA”). CHA was a “public employer” under the Massachusetts Tort Claims Act (“MTCA”), G.L.c. 258, §1 etseq. Ewing, who worked for CHA, moves for summary judgment, arguing he is immune from suit as a public employee under G.L.c. 258, §2. For the following reasons, after hearing and review of plaintiffs’ post-hearing submission,[3] the motion is ALLOWED.
BACKGROUND
In 2009, Ewing was a physician assistant employed by CHA in its Department of Orthopedic Surgery.[4] The Chief Physician Assistant in the Department of Orthopedic Surgery (“the Chief P.A.”), a CHA employee, was Ewing’s immediate supervisor. Defendant Samuel Doppelt, M.D., the Chief of Orthopedic Surgery at CHA, was Ewing’s supervising physician. The Chief P.A. and Dr. Doppelt set Ewing’s work schedule and hours. Ewing did not have any private patients at CHA, other than those he saw under Dr. Doppelt’s supervision; and had no admitting privileges at CHA.[5] Ewing was paid an hourly wage based on the number of hours he worked, unaffected by the number of patients he cared for. He did not receive performance bonuses, profit-sharing, or other financial incentives. CHA paid his wages, provided him a W-2 form, and provided all of his employment benefits, including vacation time, sick pay, health insurance, malpractice insurance, and retirement benefits. Ewing did not bill CHA patients directly for his services.
Mr. Medeiros was Dr. Doppelt’s patient. In August 2009, Mr. Medeiros had surgery at Cambridge Hospital. Dr. Doppelt performed the surgery with Ewing’s assistance. With respect to Ewing’s treatment of patients at CHA, including Mr. Medeiros, Ewing was acting under Dr. Doppelt’s direction. Ewing testified at his deposition:
Q You mentioned earlier that you were working under the license of Dr. Doppelt in 2009?
A Correct.
Q Was Dr. Doppelt able to tell you what to do in carrying out your clinical responsibilities to patients?
A Yes.
Q Direct you to order certain tests?
A Yes.
Q Could direct you to give or not give certain medications?
A Correct.
Q Direct you to write orders as to when medication should be stopped and restarted?
A Correct.
Q Could anybody else at the hospital or at Cambridge Health Alliance tell you how to do those things?
A If I was involved in direct patient care for a patient that was taken care of by another physician, they could tell me to do the same.
Transcript of Deposition of Neil Ewing, PA-C at 85-86 (Jun. 23, 2014), attached as Exhibit N to Plaintiffs, Stephen Medeiros’s and Patricia Medeiros’s, Memorandum in Opposition to Defendant, Neil Ewing, PAC’s Motion for Summary Judgment (Docket #25.2). Plaintiffs do not contest these facts. Instead, they argue, and I assume it to be true, that CHA’s administration (as opposed to Dr. Doppelt) did not have the ability to supervise the medical care and treatment provided by Ewing.
Mr. Medeiros and his wife, Patricia, allege in this action, among other things, that Ewing was negligent in managing Mr. Medeiros’s anticoagulation in August 2009. They allege that Ewing’s negligence caused Mr. Medeiros to suffer an acute ischemic stroke resulting in left-sided paralysis and other injuries.
Plaintiffs filed this case in May 2012. As against Ewing, Mr. Medeiros seeks recovery for personal injuries on theories of negligence (Count I), breach of implied warranties (Count II), and lack of informed consent (Count III);[6] while Ms. Medeiros brings claims for emotional distress (Count VI) and loss of consortium (Count VII). They assert the same claims against *256 Dr. Doppelt (Counts VIII—XIV). The case is on the verge of trial.[7]
DISCUSSION
I. The Summary Judgment Standard
Summary judgment is proper when “there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law.” Mass.R.Civ.P. 56(c). See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 712-16 (1991). When a defendant is the moving parly, the defendant must demonstrate plaintiff has no reasonable expectation of proving an essential element at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis, 410 Mass. at 716. If defendant does so, plaintiff must respond with specific facts showing a genuine issue of material fact. Mass.R.Civ.P. 56(e). Plaintiff may not rest on assertions of dispute, but must show actual disputes of fact. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). The court must resolve doubts about the evidence against the moving parly. Parent v. Stone & Webster Eng’g Corp., 408 Mass. 108, 112 (1990).
II. Immunity under Massachusetts Tort Claims Act
The MTCA provides a limited waiver of sovereign immunity. Under the MTCA, public employers are liable for the negligence of their employees subject to a cap on damages, while their public employees generally enjoy immunity from suit for negligence. G.L.c. 258, §2 states in relevant part;
Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances, except that public employers shall not be liable for interest prior to judgment or for punitive damages or for any amount in excess of $100,000.
. . . The remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the public employer or [ ] the public employee . . . and no such public employee . . . shall be liable for any injury or loss of properly or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment, provided, however, that a public employee shall provide reasonable cooperation to the public employer in the defense of any action brought under this chapter.
G.L.c. 258, §2, para. 1 (emphasis added).
The parties agree that CHA is a “public employer” under the MTCA as defined in G.L.c. 258, §1. There is no question that Ewing was paid by CHA, received his benefits from CHA, and reported to the Chief P.A. and Dr. Doppelt. The question is whether, in light of these and other factors, Ewing was a “public employee” within the meaning of the MTCA.
The MTCA defines “[p]ublic employee” to include the “employees of any public employer, whether serving full or part-time, temporaiy or permanent, compensated or uncompensated.” G.L.c. 258, §1. The mere fact that CHA is a public employer, however, does not mean that each of its employees is a “public employee.” McNamara v. Honeyman, 406 Mass. 43, 48 (1989). Nor is it dispositive that CHA paid Ewing’s wages and benefits. A physician, for example, “is not necessarily a public employee simply because a public entity pays his or her salary, provides a retirement fund, or manages a vacation schedule.” Williams v. Hartman 413 Mass. 398, 400 (1992). Although “the very nature of a physician’s function tends to suggest that in most instances he will act as an independent contractor,” Kelley v. Rossi, 395 Mass. 659, 662 (1985), “a physician can still be deemed a servant where the principal controls the details of the physician’s activities.” McNamara, 406 Mass. at 48.
Whether a person is a “public employee” is a factual question, turning largely on whether the “person is subject to the direction and control of a public employer.” Smith v. Steinberg, 395 Mass. 666, 667 (1985). See Rowe v. Arlington, 28 Mass.App.Ct. 389, 391 (1990) (“Whether one is a public employee ... is a question of fact”). In the context of a medical malpractice case, the Supreme Judicial Court has stated that the relevant question to determine if a physician is a public employee is “whether a public employer directs and controls the physician’s treatment of the patient.” Williams, 413 Mass. at 400. See, e.g., Soba v. Patnaude, 87 Mass.App.Ct. 1135, 2015 WL 4079792 at **2-3 (July 7, 2015) (Rule 1:28 decision) (reversing grant of summary judgment where, based on the record, “we cannot conclude that the sheriff or his deputies at the Worcester Counly House of Correction directed or controlled [defendant doctor’s] treatment of his inmate patients so as to make him a ‘public employee’ ”).
In contrast to the cases involving physicians with full admitting privileges to public hospitals, the courts have found a variety of other health care professionals in public hospitals to be public employees under the MTCA, even though they exercise a range of independent professional judgment for the care and treatment of patients. See, e.g., Williams v. Bresnahan, 27 Mass.App.Ct. 191, 192-93 (1989) (resident or house officer under supervision of attending physician); True-Frost v. Franco, MICV2010-4113, “Memorandum of Decision and Order . . .” at 6-13 (Mass.Super. Feb. 12, 2014) (Wilson, J.) (registered nurse and certified nurse midwife at CHA); Wilson v. Robertson, 29 Mass. L. Rptr. 484, 2012 WL 1326408 at **2-4 (Mass.Super. Feb. 13, 2012) (Curran, J.) (second-year resident at University of Massachusetts Medical *257 School); Pedro v. Goldfarb, 28 Mass. L. Rptr. 559, 2011 WL 4056342 at **4-5 (Mass.Super. Sept. 9, 2011) (Leibensperger, J.) (staff nurse at CHA); Botelho v. Chisholm, MICV2006-4080, “Memorandum and Order . . at 3-4 (Mass.Super. Dec. 24, 2010) (Billings, J.) (registered nurses at CHA); Hull v. Foley, 17 Mass. L. Rptr. 187, 2004 WL 65287 at **4-5 (Mass.Super. Jan. 15, 2004) (Agnes, J.) (physician in fellowship program at University of Massachusetts Medical Center) (and cases cited).
A physician assistant appears to work in a manner and with an amount of independence somewhere between a registered nurse and a resident or hospital fellow. Physician assistants operate within a statutory and regulatory framework that requires constant supervision by a physician. Specifically, G.L.c. 112, §9E, para. 1, authorizes a physician assistant to “perform medical services when such services are rendered under the supervision of a registered physician,” and requires such “supervision” to be “continuous.” That statute also places “legal responsibility for [the] actions and omissions” of a physician assistant employed by a health care facility squarely on the health care facility although “[s]uch physician assistants shall be supervised by registered physicians.” Id., para. 5.
The regulations in effect in 2009 also unambiguously required a physician assistant to work under the active supervision of a physician. The regulations, promulgated under G.L.c. 112, §§9C-9K, defined “(p)hysician assistant” to mean a person who meets certain registration requirements and “who may provide medical services appropriate to his or her training, experience and skills under the supervision of a registered physician.” 263 CMR§2.03. The regulations authorized a physician assistant to “serve the patients of his/her supervising licensed physician,” 263 CMR §5.03, and “under the supervision of a licensed physician, [to] perform any and all services which are (a) Within the competence of the physician assistant in question, as determined by the supervising physician’s assessment . . . and (b) Within the scope of services for which the supervising physician can provide adequate supervision to ensure that accepted standards of medical practice are followed.” 263 CMR §5.04(1). A physician assistant’s authorized area of work was required to be “consistent with his or her supervising physician’s scope of expertise and responsibility and the level of authority and responsibility delegated to him or her by the supervising physician.” 263 CMR §5.04(2). The physician assistant may not “supplant a licensed physician as the principal medical decision-maker.” 263 CMR §5.05(3).[8] The supervising physician must “afford supervision adequate to ensure . . . [t]he physician assistant practices medicine in accordance with accepted standards of medical practice,” and when the supervising physician “is unable or unavailable to be the principal medical decision-maker, another licensed physician must be designated to assume temporary supervisory responsibilities with respect to the physician assistant.” 263 CMR §§5.05(4)(a), (4)(g). Physician assistants are not authorized to bill separately for their services because the regulations declare “(t]he services of the physician assistant are the services of his or her supervising physician.” 263 CMR§5.06. Finally, and perhaps most illuminating, the regulations make clear that “[w]here a physician assistant is employed by a health care facility, the employing health care facility shall be legally responsible for the acts or omissions of said physician assistant at all times. Physician assistants who are employed by health care facilities shall nevertheless be supervised by licensed physicians.” 263 CMR §5.08.[9]
This case, like Williams v. Bresnahan, 27 Mass.App.Ct. 191, involves a healthcare professional under the direct supervision of an attending physician. In Williams, the plaintiff argued that house officers or residents at Boston City Hospital should not be considered public employees under the MTCA because they were subject to the supervision of the attending physician and not the hospital regarding their care and treatment of the plaintiff. 27 Mass.App.Ct. at 193. The Appeals Court rejected this argument, concluding if supervision by the attending physician were proved, it “would not have altered the public employee status of the defendants, and, therefore, is not sufficient to raise a genuine issue of mateñál fact that the defendants were not under the direction and control of the city. ” Id. (italics in original).
Plaintiffs advance the same argument here. The outcome is controlled by Williams. Ewing was hired by CHA and his wages and benefits were provided by CHA. He was actively supervised by Dr. Doppelt, the head of CHA’s Department of Orthopedic Surgery. He was not in any legally cognizable sense independent of either CHA’s or Dr. Doppelt’s supervision. Plaintiffs have not raised a material dispute of fact regarding whether Ewing was actively supervised by Dr. Doppelt regarding his care and treatment of Mr. Medeiros. As such, he, like the residents in Williams, was a “public employee.” Under the MTCA, he is immune from suit on claims for negligence or lack of informed consent.
IE. Breach of Implied Warranties
Count II asserts a claim for breach of warranties in connection with the care and treatment Ewing provided to Mr. Medeiros. Where only medical negligence is alleged, contract claims are not actionable. Sullivan v. O’Connor, 363 Mass. 579, 582-83 (1973); Salem Orthopedic Surgeons, Inc. v. Quinn, 377 Mass. 514, 519 (1979). Plaintiffs have not asserted that Ewing made any promises to them with regard to any medical result or outcome. Accordingly, Count II must be dismissed.
*258 ORDER
The Motion of Defendant Neil Ewing, PA-C for Summary Judgment (Docket #25) is ALLOWED. Judgment shall enter for defendant Neil Ewing, PA-C on all of plaintiffs’ claims against him.

 At the hearing, with plaintiffs’ agreement, I allowed defendant to file a Supplemental Affidavit of Neil Ewing, P.A. in Support of Motion for Summary Judgment (“the Ewing Supplemental Affidavit’’} and to provide three Superior Court decisions not referenced in defendant’s summary judgment papers. I also allowed plaintiffs an opportunity to respond to these new materials. I have since received and reviewed “Plaintiffs, Steven Medeiros’s and Patricia Medeiros’s, Supplemental Brief in Opposition to Defendant, Neil Ewing, PA-C’s Motion for Summary Judgment” (Mar. 29, 2016).

 In 2009, G.L.c. 112, §9C defined “[pjhysician assistant” as “a person who is duly registered by the board [of registration of physician assistants].” Effective November 4, 2012, §9C was amended to define “[p]hysician assistant” as “a person who is duly registered and licensed by the board.” The Legislature also adopted G.L.c. 176S in 2012 to address services provided by a physician assistant. It defines a “physician assistant” as “a person who is a graduate of an approved program for the training of physician assistants who is supervised by a registered physician in accordance with sections 9C to 9H, inclusive, of chapter 112, and who has passed the Physician Assistant National Certifying Exam or its equivalent.” G.L.c. 176S, §1 (eff. Nov. 4, 2012) (emphasis added). In deciding this motion, I do not rely on the statutory changes after 2009. All references to statutes and regulations in this decision are to the version of the statute or regulation in effect in 2009, unless otherwise indicated.

 Plaintiffs’ denial of paragraphs 14 and 17 in Defendant’s Statement of Fact, which is contained in the Consolidated Rule 9A(b}(5) Statement of Material Facts, is insufficient to contest the facts contained in this sentence. See Superior Court Rule 9A(b}(5). Ewing testified that he would staff an independent clinic where he would see patients without Dr. Doppelt. The Ewing Supplemental Affidavit clarifies that, at all times when he staffed an “independent clinic” he was doing so under Dr. Doppelt’s direction and in consultation with Dr. Doppelt as to patient care decisions.

 Mr. Medeiros’s Counts IV and v. against Ewing do not state additional claims, but articulate different damages caused by the claimed conduct asserted in Counts I, II and III; to wit, “severe emotional distress resulting in substantial physical injury” (Count IV) and “great expense for [ ] medical, surgical and hospital care and treatment” (Count V).

 Trial is scheduled to begin April 19, 2016. Plaintiffs do not complain Ewing’s summary j udgment motion is untimely.

 This provision has been re-codified at 263 CMR §5.05(2) (2013).

 This provision has been re-codified at 263 CMR §5.09 (2013).