IRENE REGINA THOMAS *vs.* SIDNEY ELLIS.

Middlesex.    May 7, 1952. — May 29, 1952.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & SPALDING, JJ.

*Negligence,* Physician and surgeon. *Evidence,* Opinion: expert; Medical publication.

Evidence, at the trial of an action against an obstetrician of wide experience, including testimony from the defendant, would warrant findings that as early as midnight he made a diagnosis that the plaintiff, his patient, had a separated placenta; that accepted medical practice in the community demanded that he attend the plaintiff immediately after such diagnosis but that he did not do so until about 7 o'clock the next morning; that later in the day a Caesarean operation was performed on the plaintiff, her baby was born dead, and the defendant's diagnosis was confirmed; that within twenty-four hours previously he had performed a version on the plaintiff, an act which he believed to be dangerous and which could be a cause of a separated placenta; and that in the circumstances he did not exercise the care and skill required of him.

At the trial of an action against an obstetrician for negligent treatment
and care, the admission in evidence of extracts from a medical text-
book published ten years before such treatment and care was not
shown by the record to have been error for want of the preliminary
findings required by G. L. (Ter. Ed.) c. 233, § 79C, inserted by St.
1949, c. 183, § 1, or of evidence to support them, or on the ground
that as matter of law there were supervening developments in obstetri-
cal science during the ten years which precluded a preliminary finding
of relevancy of such extracts.

CONTRACT OR TORT. Writ in the Superior Court dated
October 30, 1948.

The action was tried before *Collins,* J.

*John F. Dunn,* for the defendant.

*Thomas B. Shea,* (*Benedict F. Fitzgerald, Jr.,* with him,)
for the plaintiff.

WILKINS, J. The plaintiff had a verdict in an action
against the defendant, a physician, for negligent treatment
and care in an obstetrical case. The defendant's exceptions
are to the admission of evidence and to the denial of his
motion for a directed verdict.

1. We mention facts which the jury could have found
and some of the evidence which, although disputed, they
could have believed. The defendant was an obstetrician
of wide experience, whom the plaintiff first consulted on
August 29, 1946, when she was about four months pregnant
with her first baby. It was agreed that he would give her
prenatal care and would deliver her baby at a certain
hospital in Cambridge, where she lived. She visited his
office every few weeks, and all was proceeding in a normal
manner. Her sixth and last visit was on January 6, 1947,
within three or four weeks of her expected date of confine-
ment. The defendant testified that on that occasion every-
thing was normal, including the position of the fetus, which
he did nothing to change, as the head was engaged in the
pelvis. On the other hand, the testimony of the plaintiff
was that on that occasion the defendant caused her to lie
on the examining table, listened to the fetal heart, and
"turned the child"; that he placed his hands on each side
of her abdomen, and with "a quick sharp motion he pushed

his hands down so that what was in her stomach turned around"; that she felt a sharp pain and screamed, "What are you doing?"; that the defendant replied, "I pushed the child's head downward"; that she experienced "a terrible sharp gripping pain . . . all over her stomach"; and that he told her to expect the baby at any time, to call him at the first sign, and that he would come as soon as she called.

The plaintiff further testified that about eleven o'clock that same evening, while in bed, she felt a sudden gush of blood which "hit down to her ankles" with great force. It was "coming down all the time," and she suffered great pain. The plaintiff's husband testified that about 11:30 P.M. he telephoned the defendant, and told him that she was ready to go to the hospital, was gushing blood and suffering severe abdominal pain, and that the defendant should come immediately; that the defendant told him to observe the plaintiff for an hour and to call him back; that he observed the plaintiff's condition; that there was "more blood all over the blanket, a lot of blood"; that he called the defendant again in half an hour, he could not wait the full hour; that he told the defendant that she was continuing to bleed and was suffering great pain, and asked what he should do; that the defendant said that it sounded like a separation of the placenta, and that the defendant would meet him at the hospital immediately; and that he then drove the plaintiff to the hospital, arriving at 12:30 A.M.

What happened during the remainder of the night is disputed. The defendant testified that he received a telephone call from the hospital at 1 A.M. and went there immediately, arriving at 1:30 A.M.; that he examined the plaintiff and observed that she was in mild labor; that he was not certain that true labor had started; that her membranes had ruptured; that he observed no blood; that he concluded that the fetal heartbeats were normal; that after fifteen minutes he went to another patient at another hospital; that when he left, the baby was alive and "things were proceeding along"; that around 5 A.M. he received a

telephone call from the night supervisor to the effect that the patient had become nauseated, vomited, and passed two blood clots, following which the nurse listened for the fetal heartbeat, which had not been present for a half hour; that his diagnosis at that time was separation of the placenta, and he felt able to make that diagnosis from the telephone conversation; that after receiving "a call of that nature, passage of the blood, abdominal pain," his first duty was to go to the hospital immediately; that he always did that; that that was the accepted practice in the community; that he saw the plaintiff a little after 5 A.M.; and that he could not hear the fetal heartbeat, the obvious explanation being that the baby was probably dead and had died during his absence.

On the other hand, there was testimony from another patient that she was in the "labor room" with the plaintiff from about the time of her arrival; that she did not see the defendant there at any time between 1 A.M. and 3 A.M.; that she saw two doctors between 7:30 A.M. and 8:30 A.M.; and that they were the first men she saw in the room. The plaintiff testified that she saw no doctor before 3 A.M.; and that the first time she saw the defendant was in the morning daylight. The plaintiff's husband testified that he stayed at the hospital till 3:45 A.M.; that he did not see the defendant; that he received a telephone call from the defendant between 7 A.M. and 7:30 A.M.; that the defendant said, "I just arrived. Come down immediately. It is important, but don't be alarmed"; that he went to the hospital; and that then the defendant informed him that the plaintiff must have an operation.

A Caesarean operation was performed at 11 A.M. The baby was born dead. The defendant's diagnosis was confirmed. The placenta was completely detached. The plaintiff "had the ultimate in complication of abruptio placentae."

There was considerable expert testimony from the defendant. There are four types of separated placentae. In the type which the plaintiff developed, there is bleeding into the muscle fiber of the uterus. This is a very serious complica-

tion, and when diagnosed properly, a Caesarean operation should be performed and the uterus emptied as quickly as possible. It is unusual for the placenta to separate before the baby leaves the womb. There are a number of causes for such an occurrence: trauma; version, properly or improperly done; and any disturbance of any magnitude to the fetus or to the mother. A version is a procedure whereby the baby's position is changed externally. It means that if the buttocks were downward, the baby is turned around so that the head would be downward. The defendant testified that there was no version operation on the plaintiff, because the head was always down; that he never told her that he performed a version operation; that version was one procedure he had been set against his whole life; that he had always taught and preached against it; that it was accepted practice in some places, some people did it; but that he did not do it, because he thought the procedure was highly dangerous.

There was no error in denying the motion for a directed verdict. On the evidence, it could have been found that the defendant made a diagnosis of a separated placenta as early as 12 P.M. on January 6; that he did not see the plaintiff until dawn or 7 A.M. on January 7; and that in the type of separated placenta which the plaintiff had, when diagnosed properly, a Caesarean operation should have been performed and the uterus emptied as quickly as possible. To be sure, the defendant testified that he did not make the diagnosis till 5 A.M., and did so on what he learned over the telephone from the night supervisor; that his first duty then was to go to the hospital immediately; and that that was the accepted practice in the community. The jury could have found that the information which the husband testified he gave the defendant before midnight of the day before was similar to that which the defendant testified he received from the night supervisor, and that, in accordance with his own testimony as to the practice in the community, he should have gone to the hospital the night before, or in any event

before dawn.  Moreover, if the jury believed that a version was performed on the plaintiff, they could find that the defendant had within twenty-four hours performed an act which he believed to be dangerous and which, however well done, could be a cause of a separated placenta.  In those circumstances, without reference to the extracts from the medical treatises hereinafter discussed, the jury could find that he did not exercise the care and skill required of him as an obstetrician.  *Gabrunas* v. *Miniter*, 289 Mass. 20, 22. *Tallon* v. *Spellman*, 302 Mass. 179, 183.  *Malone* v. *Bianchi*, 318 Mass. 179, 181–182.  The plaintiff sustained harm.  We cannot accept the defendant's argument that evidence of causal negligence was lacking.

2. The question of evidence concerns the admission of extracts from two medical treatises.

General Laws (Ter. Ed.) c. 233, § 79C, inserted by St. 1949, c. 183, § 1, reads: "A statement of fact or opinion on a subject of science or art contained in a published treatise, periodical, book or pamphlet shall, in the discretion of the court, and if the court finds that it is relevant and that the writer of such statement is recognized in his profession or calling as an expert on the subject, be admissible in actions of contract or tort for malpractice, error or mistake against physicians, surgeons, dentists, optometrists, hospitals and sanitaria, as evidence tending to prove said fact or as opinion evidence; provided" that the person intending to offer the evidence gives a certain notice which in the case at bar, it was agreed at the trial, was given.

The defendant testified that he was acquainted with recognized treatises in the field of obstetrics, and had received two lists of such items from the plaintiff's attorney. He named those he knew best, and did not name two books on the list which are hereinafter referred to.  He also testified that he examined the lists and recognized many of the books and authorities; that he thought the authors knew their business; and that he conducted his practice in obstetrics in accordance with the procedures and findings recommended by those men.

At the conclusion of the oral testimony, the plaintiff offered in evidence certain passages from a book entitled "Textbook of Obstetrics" by Edward A. Schuman, A.B., M.D., F.A.C.S., professor of obstetrics in the School of Medicine, University of Pennsylvania, 1937 edition. The defendant's counsel thereupon stated during a colloquy at the bench, "[T] he defendant objects to the introduction of these statements on the ground that the textbook offered was published in 1937, that the state of obstetrics and the science of medicine have changed considerably. The method of treatment has changed since 1937; the management and care of obstetrical cases, because of new drugs and new procedures developed, have changed the accepted practice in connection therewith so that in 1947 the rule of law which required a doctor to exercise and possess that degree of skill and care in the community, according to the state of the science at that time, must of necessity prohibit the introduction of evidence of practice as it was back in 1937." The judge said, "There being no evidence of any change in the practice of obstetrics since 1937, the evidence is allowed to stand for what it is worth." The extracts were read to the jury. · The plaintiff then offered in evidence certain passages from a book entitled "Management of Obstetrical Difficulties" by Paul Titus, M.D., third edition, dated 1945. In another colloquy at the bench, the defendant renewed his previous objection, and the judge permitted two passages to be read to the jury.

At the colloquy at the bench respecting the first book, the defendant's only objection was based upon an asserted change in the science of medicine and obstetrics between 1937 and 1947. No other aspect of the statute was mentioned. In the circumstances, assuming the point is now open to the defendant, the judge must be taken to have made all the preliminary findings requisite under the statute, namely, that the statements were relevant and that the writer was recognized in the medical profession as an expert in obstetrics. A statement of the topics of the excerpts admitted in evidence shows their general relevancy:

"The Conduct of Labor," the subparagraph entitled "The Answer to the Call"; "The Premature Separation of the Normally situated Placenta," the subparagraph "Symptoms." The record does not show that no evidence was offered on the preliminary question of relevancy or that the judge during the colloquy at the bench did not learn what were the proffered excerpts. Furthermore, the judge could find on the defendant's testimony on the stand that the writer was an expert, and that the writer's statements, although published in 1937, were pertinent to conditions in 1947. The record likewise does not show that the preliminary requirements were not satisfied, or that as matter of law during those ten years there were supervening developments in obstetrical science which precluded a preliminary finding of relevancy. The case is, therefore, in no way analogous to *Hasey* v. *Boston*, 228 Mass. 516, or to *Horan* v. *Boston Elevated Railway*, 237 Mass. 245, relied upon by the defendant. Nor is the admission of the excerpts a departure from the established standard that the defendant owed the plaintiff the duty to have and use the care and skill commonly possessed and used by similar specialists in like circumstances. *Gabrunas* v. *Miniter*, 289 Mass. 20, 21.

The admission of the excerpts from the second book presents no new question.

*Exceptions overruled.*