Donna Feeley, administratrix,[1] *vs.* Stephen Baer & another.[2]

Middlesex. February 6, 1997. - May 9, 1997.

Present: Wilkins, C.J., Lynch, O'Connor, Fried, & Marshall, JJ.

*Negligence,* Medical malpractice. *Doctor,* Duty to disclose to patient. *Medical Malpractice,* Consent to medical treatment.

In a medical malpractice action, the judge correctly allowed the defendant's motions for directed verdicts where the evidence did not permit a finding that the risk to a child in utero of serious infection was more than negligible such that disclosure of that risk would have been material to the plaintiff mother's decision in choosing between alternative courses of treatment relating to delivery of the child. [876-878] O'Connor, J., concurring with whom Lynch, J., joined.

Civil action commenced in the Superior Court Department on September 26, 1989.

The case was tried before *Julian T. Houston,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Raymond J. Kenney, Jr.,* for Stephen Baer.

*Frank E. Reardon* for Richard McNeer.

*Philip J. Crowe, Jr.,* for the plaintiff.

*Thomas R. Kiley, Carl Valvo,* & *Matthew L. Schemmel,* for the Professional Liability Foundation, Ltd., amicus curiae, submitted a brief.

Wilkins, C.J. A Superior Court judge ruled that the evidence was not sufficient to raise a question for the jury on the plaintiff's claim that each defendant physician had failed in his duty to disclose in a reasonable manner certain medical information that would have been material to an intelligent decision by the pregnant plaintiff whether to have labor induced or to wait for spontaneous labor. The Appeals Court

[1] Of the Estate of Eric Feeley.

[2] Richard McNeer.

concluded, however, that the evidence presented a jury question whether each defendant should have realized that, if he had disclosed the risk of infection to the child which the decision to await natural labor presented, that disclosure would have been material to the plaintiff mother's decision in choosing between the alternative courses of treatment. *Feeley* v. *Baer*, 41 Mass. App. Ct. 239, 243-244 (1996). We granted the defendant doctors' applications for further appellate review.

We agree with the trial judge. The evidence would not permit a finding that the risk to the child of *serious* infection was more than negligible. "The materiality of information about a potential injury is a function not only of the severity of the injury, but also of the likelihood that it will occur. Regardless of the severity of a potential injury, if the probability that the injury will occur is so small as to be practically nonexistent, then the possibility of that injury occurring cannot be considered a material factor in a rational assessment of whether to engage in the activity that exposes one to the potential injury." *Precourt* v. *Frederick*, 395 Mass. 689, 694-695 (1985). See *Harnish* v. *Children's Hosp. Medical Ctr.*, 387 Mass. 152, 156 (1982).

The Appeals Court presented the facts underlying the claim as follows:

> "In 1987, Donna Feeley (Feeley), Eric's mother, became pregnant for the fourth time and experienced a normal course of pregnancy without any prenatal problems. On the morning of Monday, October 12, 1987, two days after her due date, Feeley's water broke, and she was admitted to Beth Israel Hospital at noon. She was not in labor when she arrived at the hospital. Her treating physicians, the defendants Dr. Richard McNeer and Dr. Stephen Baer, without discussing the matter with Feeley, chose a course of treatment known as 'expectant management.' This approach is based upon the theory that once the membranes have ruptured, the pregnancy should proceed naturally to spontaneous labor without surgical intervention or medication to induce labor, provided that there is no indication of other reasons to intervene. Feeley went into labor on Wednesday evening and gave birth shortly thereafter."

*Feeley* v. *Baer*, *supra* at 240. Eric died five days later of

streptococcus pneumonia, which Feeley's expert described as "a rare pathogen, and not one that's routinely looked for," but one that could be picked up in the birth canal.

All the experts acknowledged that once a woman's membranes have ruptured, there is a risk of infection and that one must be alert for evidence of infection. There was evidence that the risk increases with time following the rupture. Such an infection can be simple or serious. The plaintiff's expert testified that Eric contracted the infection in his mother's uterus and would not have done so if he had been delivered on Tuesday, the day after Feeley was admitted to the hospital.

The plaintiff's theory, which was accepted by the Appeals Court (*Feeley* v. *Baer, supra* at 243), is that, because there was more than a negligible risk of infection, the doctors had to explain that risk and obtain Feeley's informed consent to the course of treatment that they followed.[3] We agree with the plaintiff that she did not have to prove that the risk to Eric of contracting streptococcus pneumonia itself was more than negligible. See *McMahon* v. *Finlayson*, 36 Mass. App. Ct. 371, 374-375 (1994) (obligation to disclose that there were risks to various organs in operative field which collectively would be material to patient's decision). The risk that must exist in order to invoke informed consent principles in this case is a more than negligible risk of one or more infections that will have serious consequences.

The deficiency in the plaintiff's proof is that there was no evidence that pursuing the "expectant management" procedure created more than a negligible risk of serious infection from streptococcus pneumonia or any other possible serious infection. The allowance of the defendants' motions for

---

[3]There is no doubt that, in the circumstances, Feeley could exercise judgment and give informed consent on behalf of her unborn child.

The fact that one alternative involved in this case was "letting nature take its course," that is, no invasive treatment, does not affect the informed consent analysis. See *Harnish* v. *Children's Hosp. Medical Ctr.*, 387 Mass. 152, 156 (1982) ("Appropriate information may include . . . the likely result of no treatment . . ."). See also *Wecker* v. *Amend*, 22 Kan. App. 2d 498, 502 (1996) ("in situations where no treatment at all is a reasonable medically acceptable option, common sense dictates that such information constitutes a fact" necessary to form the basis of an intelligent consent by the patient to the proposed treatment).

directed verdicts was correct. We agree with the Appeals Court on the other issues that it considered.[4]

*Judgment affirmed.*

O'CONNOR, J. (concurring, with whom Lynch, J., joins). I agree that "there was no evidence that pursuing the 'expectant management' procedure created more than a negligible risk of serious infection" and that therefore the defendants were entitled to directed verdicts. *Ante* at 877. I write separately, however, to make clear that I do not subscribe to the notion, apparently accepted by this court and by the Appeals Court (see 41 Mass. App. Ct. 239, 242 [1996]), that the informed consent doctrine articulated in *Harnish* v. *Children's Hosp. Medical Ctr.*, 387 Mass. 152 (1982), and *Precourt* v. *Frederick*, 395 Mass. 689 (1985), applies to a situation in which the physician has not subjected the patient to bodily invasion, surgically or otherwise.[1] Because the plaintiff in this case has neither alleged nor produced evidence of bodily invasion, she is not entitled to recovery based solely on the absence of her informed consent. That would be true even if the plaintiff had produced evidence that pursuing the expectant management procedure created more than a negligible risk of serious infection. When a plaintiff claims injury and seeks to recover on an informed consent theory, as distinguished from a conventional medical malpractice approach, the absence of

[4]The doctors did not raise the issue to which the concurring opinion is directed either in their applications for further appellate review or in their supplemental briefs to this court.

Most authorities "prefer to treat informed consent liability solely as an aspect of malpractice or negligence." 1 F. Harper, F. James, & O. Gray, Torts § 3.10, at 3:45-3:46 (3d ed. 1996). One reason is "that the problem of informed consent is essentially one of professional responsibility, not intentional wrongdoing, and can be handled more coherently within the framework of negligence law than as an aspect of battery." *Id.* at 3:46-3:47.

[1]The court states that the doctors did not raise this issue "either in their applications for further appellate review or in their supplemental briefs to this court." *Ante* at 878 n.4. However, the parties argued this issue at length in their briefs to the Appeals Court, which briefs were later filed in the Supreme Judicial Court along with supplemental briefs. In any event, my objective in writing this concurring opinion is not to affect the result of this case but instead is to affect the developing law in what I consider to be a sound way.

a bodily invasion, which would trigger the need for consent, is dispositive, entitling the defendant to judgment.

In *Harnish, supra* at 153, "[t]he plaintiff underwent an operation to remove a tumor in her neck. During the procedure, her hypoglossal nerve was severed, allegedly resulting in a permanent and almost total loss of tongue function." In that context, the court stated, " 'There is implicit recognition in the law of the Commonwealth, as elsewhere, that a person has a strong interest in being free from nonconsensual invasion of his bodily integrity. . . . In short, the law recognizes the individual interest in preserving "the inviolability of his person." *Pratt* v. *Davis*, 118 Ill. App. 161, 166 (1905), aff'd, 224 Ill. 300 (1906). One means by which the law has developed in a manner consistent with the protection of this interest is through the development of the doctrine of informed consent.' *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 738-739 (1977)." *Harnish, supra* at 154. It is clear from the material quoted from *Harnish*, as well as from the entire *Harnish* opinion, that the court was not suggesting that a patient has a right to require her doctor to operate on her or medicate her because she has not given the doctor her informed consent to be left alone.

In note 3, *ante* at 877, the court quotes from *Harnish, supra* at 156, as follows: "Appropriate information may include . . . the likely result of no treatment . . . ." The *Harnish* court's full statement, which was made in the context of a case in which surgery had been performed, was this: "Appropriate information may include the nature of the patient's condition, the nature and probability of risks involved, the benefits to be reasonably expected, the inability of the physician to predict results, if that is the situation, the irreversibility of the procedure, if that be the case, *the likely result of no treatment*, and the available alternatives, including their risks and benefits" (emphasis added). Once again it is clear that the court's focus was solely on the physician's duty to obtain the patient's informed consent to validate invasion of the patient's bodily integrity.

In *Wecker* v. *Amend*, 22 Kan. App. 2d 498 (1996), also cited by the court, *ante* at 877 n.3, the plaintiff was advised to undergo, and did undergo, an invasive procedure, laser surgery, which resulted in extensive postoperative bleeding. There, the plaintiff's doctor failed to advise her of the likely

consequences of forgoing surgery altogether, prompting the court to comment:

> "[I]n situations where no treatment at all is a reasonable medically acceptable option, common sense dictates that such information constitutes a fact 'which [is] necessary to form the basis of an intelligent consent by the patient to the proposed treatment.' . . . In other words, how can a patient give an informed consent to treatment [i.e., laser surgery] for a condition if the patient is not informed that the condition might resolve itself without any treatment at all?"

*Id.* at 502, quoting *Natanson* v. *Kline*, 186 Kan. 393, 407 (1960). Nowhere in its opinion did that court suggest that had the patient been advised to forego laser surgery, and did so, liability could attach under the doctrine of informed consent.

The doctrine of informed consent has its foundations in the law of battery. 1 F. Harper, F. James, & O. Gray, Torts § 3.10, at 3:45-3:46 (3d ed. 1996). The court, *ante* at n.4, states, "Most authorities 'prefer to treat informed consent liability solely as an aspect of malpractice or negligence.' 1 F. Harper, F. James, & O. Gray, Torts § 3:10, at 3:45-3:46 (3d ed. 1996). One reason is 'that the problem of informed consent is essentially one of professional responsibility, not intentional wrongdoing, and can be handled more coherently within the framework of negligence law than as an aspect of battery.' *Id.* at 3:46-3:47." That passage continues:

> "Also, the statute of limitations for negligence is often more favorable to plaintiffs than that for battery. There is also occasional concern that some physicians' malpractice insurance policies may not cover battery because of an exclusion of liability for criminal acts. At times, however, an action in battery may be essential for a plaintiff who cannot otherwise recover for failure to obtain informed consent. In such cases courts sometimes find that the particular facts are more nearly analogous to *touching* without consent, which all agree is battery, than to a consented *touching* for which consent was induced by inadequate information" (emphasis added).

*Id.* at § 3.10, at 3:47. It is clear that the quoted material

focuses on the question whether liability for touching (bodily invasion) without informed consent sounds or should sound in battery or negligence. Nothing in the passage suggests that the doctrine of informed consent is applicable on one ground or the other where there has been no touching — no bodily invasion. Whatever the doctrine's current footing, be it in battery or negligence, the rationale for the doctrine remains the same. Personal autonomy demands that a competent adult consent to any invasion of his or her being. Where no invasion is undertaken, no need for consent arises. All of our prior cases involving this theory have involved a bodily invasion. See *Aceto* v. *Dougherty*, 415 Mass. 654, 655 (1993) (colonoscopy); *Norwood Hosp.* v. *Munoz*, 409 Mass. 116, 117 (1991) (blood transfusion); *Martin* v. *Lowney*, 401 Mass. 1006, 1006-1007 (1988) (surgery); *Precourt* v. *Frederick*, 395 Mass. 689, 690-691 (1985) (prescription drug side effects); *Forlano* v. *Hughes*, 393 Mass. 502, 509 (1984) (myelography); *Halley* v. *Birbiglia*, 390 Mass. 540, 542 (1983) (arteriogram); *Harnish*, *supra* at 153 (surgery). The problem with ignoring altogether the foundations of the informed consent doctrine is easily illustrated. What if, in the instant case, the plaintiff, on being warned of the risks of letting nature take its course, had withheld her consent to that "treatment?" Would her doctors have then been obligated to forgo letting nature take its course, even where alternative invasive procedures were not medically indicated or recommended? "It would be anomalous to create a legally imposed duty which would require a physician to disclose and offer to a patient a medical procedure which, in the exercise of his or her medical judgment, the physician does not believe to be medically indicated." *Vandi* v. *Permanente Medical Group, Inc.*, 7 Cal. App. 4th 1064, 1071 (1992). Does the law require a doctor to obtain a patient's consent before the doctor prescribes bed rest, if that be medically sound "treatment?" The answer should be, "No." We have never held otherwise.