# United States Court of Appeals

## For the First Circuit

No. 01-1373

MELVIN D. HARRISON, PPA KENYEDA TAFT,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Lynch and Lipez,
Circuit Judges.

Adam R. Satin, with whom Andrew C. Meyer, Jr., William J. Thompson, and Lubin & Meyer, P.C., were on brief, for appellant.
Mary Elizabeth Carmody, Assistant U.S. Attorney, with whom James B. Farmer, United States Attorney, were on brief, for appellee.

April 1, 2002

**TORRUELLA**, **Circuit Judge**.  This is an appeal from a bench trial in a medical malpractice case brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).  Kenyeda Taft, on behalf of her minor son, Melvin Harrison, sued Dr. Louis Laz, her obstetrician and a federal employee, for injuries allegedly sustained by Melvin during his birth.  The complaint set forth two grounds for finding negligence: failure to meet the standard of care and lack of informed consent.  The district court, after a five-day trial, concluded that Dr. Laz was not negligent under either theory and concomitantly entered judgment for the defendant of record, the United States.  Plaintiff-appellant, Melvin Harrison, appeals the judgment on the informed consent claim.  For the reasons discussed below, we vacate the judgment and remand to the district court judge.

**I.**

In 1996, Kenyeda Taft ("Ms. Taft") was pregnant with Melvin Harrison, her second child.  In March of that year, Ms. Taft, almost four months pregnant, began her prenatal care at the Lynn Community Health Center ("Lynn CHC") with an initial screening visit conducted by a nurse practitioner.  During this visit, Ms. Taft provided a medical history, including the fact that her first child, due to her large size of 9 pounds and 3 ounces, suffered an injury during vaginal birth that resulted in Erb's Palsy.[1]

---

[1]  Erb's Palsy is a brachial plexus injury, which results in decreased mobility and functionality of the affected upper

-2-

Ms. Taft first met with Dr. Louis Laz ("Dr. Laz"), a Board-certified obstetrician and gynecologist, at the Lynn CHC on April 29, 1996. Ms. Taft informed Dr. Laz that her first child suffers from Erb's Palsy as a result of a shoulder dystocia,[2] due to the baby's large size. At the time, Dr. Laz's general practice with patients who had had a prior large baby was to determine the estimated fetal weight by ultrasound at about 37 weeks' gestation. If the estimated weight was 4500 grams or more, Dr. Laz would offer the patient an elective Cesarean section ("C-section"). If the estimated weight was under this threshold, Dr. Laz would recommend inducing labor at 37 or 38 weeks' gestation.

In addition to her previous large child, Ms. Taft presented with other risk factors that increased the likelihood that her second baby would also be large, and therefore more likely to suffer complications, such as a shoulder dystocia or brachial plexus injury, during a vaginal birth: she was pregnant with her second child, and second children are usually larger than first; the fetus was male, and males are generally larger; Ms. Taft was an obese woman at the time of her pregnancy; Ms. Taft experienced excessive weight gain during the pregnancy; and her prior delivery resulted in an Erb's Palsy injury. While Dr. Laz recognized these

extremity.

[2] Shoulder dystocia is a complication that can occur during a vaginal birth where the fetus' shoulders impede the fetus' passage through the birth canal after the head has been delivered. Shoulder dystocia can cause Erb's Palsy, although Erb's Palsy can also occur spontaneously.

risk factors, he considered them to be normal birth risks and therefore did not discuss them with Ms. Taft.

After meeting with Ms. Taft, Dr. Laz obtained the delivery record for Ms. Taft's first child, Keneisha Taft, from Salem Hospital. At trial, Dr. Laz testified that it was his general practice to request the hospital delivery notes for any patient who had a history of delivery complications. The delivery record of Dr. Orkin, the treating obstetrician, indicated that Keneisha's birth occurred "without any complications." Dr. Laz, considering the obstetrician's delivery notes to be the "gold standard of what happened at that delivery," concluded that Ms. Taft did not experience a shoulder dystocia during her first birth. Therefore, Dr. Laz believed that the Erb's Palsy developed spontaneously, rather than as a result of a shoulder dystocia. Although Dr. Laz testified that he would have discussed an elective C-section with a patient where there was documented evidence of a prior shoulder dystocia resulting in an injury, he did not do so in this case, since the delivery notes did not document such complication.

On September 12, 1996, at approximately 37 weeks' gestation, in accordance with Dr. Laz's general practice, Ms. Taft had an ultrasound at Union Hospital to estimate the fetal weight. The ultrasound report estimated the fetal weight to be 3676 grams (a little over 8 pounds). Because the estimated weight was under the 4500 grams threshold, Dr. Laz determined that a vaginal delivery, as opposed to a C-section, was the appropriate mode of

-4-

childbirth. Dr. Laz recommended to Ms. Taft that labor be induced, but he did not discuss with her either the risks of vaginal birth or the possibility of a C-section.

On September 17, 1996, Ms. Taft, at 37.5 weeks' gestation, was admitted to Beverly Hospital for induction of labor. During labor, the baby's head crowned, but the shoulders did not deliver. Dr. Laz and the delivery team followed standard steps to attempt to resolve the shoulder dystocia. After these steps were unsuccessful, Dr. Laz delivered the posterior (right) arm, which then allowed delivery of the baby at 12:46 a.m. on September 18. The baby, Melvin Harrison, weighed 4508 grams (9 pounds and 15 ounces) at birth and had a weakness of the right arm and hand, which was subsequently diagnosed as Erb's Palsy.

The plaintiff filed suit against Dr. Laz for medical malpractice in Essex County Superior Court. However, since Dr. Laz was a federal employee at the time he treated Ms. Taft, the action was removed to the United States District Court for the District of Massachusetts, and the United States was substituted as the defendant. The plaintiff's suit was premised on two grounds of negligence: (1) Dr. Laz's failure to meet the standard of care by not originally offering an elective C-section and by not performing a C-section during labor based on fetal heart monitorings; and (2) Dr. Laz's failure to obtain Ms. Taft's informed consent by not discussing the risks of vaginal birth and disclosing the alternative of a C-section. A bench trial began on December 18, 2000. At the close of the plaintiff's case, the district court

granted the United States' motion for judgment as a matter of law on the question of Dr. Laz's compliance with the standard of care during labor.

At the conclusion of the trial, the district court determined that Dr. Laz did not fail to obtain the patient's informed consent and entered judgment for the defendant. The court found that, although the risks of vaginal birth for the baby were "something more than negligible," when these risks were balanced against the risks to the mother from a C-section, "a cesarean section to avoid brachial plexus injury was not a reasonable medical judgment." Therefore, even though the court found that Ms. Taft would have opted for a C-section if informed of the possibility, the court concluded that "Dr. Laz was under no duty to afford [Ms. Taft] the opportunity to have a cesarean section . . . ."

The plaintiff appeals the court's judgment only on the informed consent claim, arguing that Dr. Laz, because such information was material to her decision to deliver vaginally, did have a duty to inform Ms. Taft of both the risks of vaginal birth and the availability of a C-section as an alternative method of childbirth.

**II.**

We review a district court's factual findings for clear error. See Fed. R. Civ. P. 52(a); La Esperanza de P.R., Inc. v. Pérez y Cía. de P.R., Inc., 124 F.3d 10, 15 (1st Cir. 1997). "We deem a finding to be clearly erroneous only when, after reviewing

-6-

the entire record, we are left with the definite and firm conviction that a mistake has been committed." La Esperanza, 124 F.3d at 15 (internal quotation marks omitted). Questions of negligence decided in a bench trial are treated as questions of fact, or as mixed questions of fact and law, and are therefore evaluated under this deferential standard. See id. at 15-16.

However, when the district court's factual findings are premised on an incorrect interpretation of the relevant legal principles, we do not owe the court the same level of deference. See United States v. 15 Bosworth St., 236 F.3d 50, 54 (1st Cir. 2001); Vinick v. United States, 205 F.3d 1, 6-7 (1st Cir. 2000). "Instead, we treat the trial court's conclusion as a question of law," Vinick, 205 F.3d at 7, and review it de novo. 15 Bosworth St., 236 F.3d at 53.

**III.**

Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), state law is "the source of substantive liability." Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 477-78 (1994). To recover under a theory of informed consent in Massachusetts, a patient must prove that the physician has a duty to disclose certain information and that a breach of that duty caused the patient's injury. See Halley v. Birbiglia, 458 N.E.2d 710, 715 (Mass. 1983). To establish a breach of the physician's duty of disclosure, the plaintiff must establish that: (1) a sufficiently close doctor-patient relationship exists; (2) the doctor knows or should know of the information to be disclosed; (3) the information is such that the

doctor should reasonably recognize that it is material to the patient's decision; and (4) the doctor fails to disclose this information. See id. In this case, only the materiality of the information to the patient is contested.[3]

If a duty exists, a physician must disclose "sufficient information to enable the patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure." Harnish v. Children's Hosp. Med. Ctr., 439 N.E.2d 240, 242 (Mass. 1982). Failure to do so constitutes medical malpractice. See id.

There are two primary standards for determining the requisite scope of the physician's disclosure in informed consent cases: "customary practice" and "materiality." See id. at 243-44; Canterbury v. Spence, 464 F.2d 772, 786-87 (D.C. Cir. 1972). Many jurisdictions require a physician to disclose whatever information a reasonable physician in similar circumstances would customarily disclose. See Harnish, 439 N.E.2d at 243; Canterbury, 464 F.2d at 786 & n.70. The Commonwealth of Massachusetts, however, has rejected the customary practice standard as providing insufficient protection for the patient's autonomy, which is the very purpose of disclosure.[4] See Harnish, 439 N.E.2d at 243-44; Precourt v.

_____

[3] Appellee, in its brief, states that the doctor's knowledge of the information is also disputed. However, the doctor's knowledge is not at issue given his and defense counsel's admission at trial that he was aware of Ms. Taft's risk factors for delivering a large child.

[4] The Supreme Judicial Court of Massachusetts has, in prior cases, cited Canterbury with approval for its explanation rejecting the customary practice standard:

-8-

<u>Frederick</u>, 481 N.E.2d 1144, 1149 (Mass. 1985) (balancing patient's right to self-determination and desire to not unduly burden practice of medicine). Instead, Massachusetts has adopted the "materiality" standard, requiring the physician to disclose "information he should reasonably recognize is material to the [patient's] decision." <u>Harnish</u>, 439 N.E.2d at 243.

"'Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment.'" <u>Id.</u> at 243 (quoting <u>Wilkinson</u> v. <u>Vesey</u>, 295 A.2d 676 (R.I. 1972)). Material information "may include the nature of the patient's condition, the nature and probability of risks involved, the benefits to be reasonably expected, . . . the likely result of

> The decision to unveil the patient's condition and the chances as to remediation, as we shall see, is ofttimes a non-medical judgment and, if so, is a decision outside the ambit of the special [medical] standard. Where that is the situation, professional custom hardly furnishes the legal criterion for measuring the physician's responsibility to reasonably inform his patient of the options and the hazards as to treatment.
> . . . .
> . . . Any definition of scope [of disclosure] in terms purely of a professional standard is at odds with the patient's prerogative to decide on projected therapy himself. That prerogative, we have said, is at the very foundation of the duty to disclose, and both the patient's right to know and the physician's correlative obligation to tell him are diluted to the extent that its compass is dictated by the medical profession.

464 F.2d 785-86.

-9-

no treatment, and the available alternatives, including their risks and benefits."  Id.

Whether a risk of injury is material to a patient depends upon the severity of the potential injury as well as the probability of its occurrence.  See Precourt, 481 N.E.2d at 1148. If the likelihood of an injury occurring is negligible, then the risk is not considered material, and the risk is insufficient to trigger the physician's duty to disclose.[5]  See Feeley v. Baer, 679 N.E.2d 180, 182 (Mass. 1997) (holding that physician had no duty to disclose risk of serious infection because plaintiffs failed to prove that there was "more than a negligible risk"); Precourt, 481 N.E.2d at 1148 (noting that a risk of injury "cannot be considered a material factor" if the probability of its occurrence "is so small as to be practically nonexistent").  Similarly, if the severity of the potential injury is "very minor," the risk is immaterial and need not be disclosed. Precourt, 481 N.E.2d at 1149 (quoting LaCaze v. Collier, 434 So.2d 1039, 1046 (La. 1983)) (internal quotation marks omitted).

In the case at hand, the plaintiff, citing to Feeley, argues that any risk that is more than negligible automatically qualifies as a material factor that must be disclosed. See Feeley, 679 N.E.2d at 182 (stating that "[t]he risk that must exist in order to invoke informed consent principles in this case is a more

_____

[5]  We note, however, that there is no "magic number" for determining whether a probability of injury is sufficient to make the risk material.  See Canterbury, 464 F.2d at 788 & n.86 (citing cases, among which one percent chance of loss of hearing was material but 1.5 percent chance of loss of eye was not material).

-10-

than negligible risk . . . ."). The defendant, however, challenges the plaintiff's understanding of the Commonwealth's informed consent law. The defendant argues that <u>Feeley</u> and the other Massachusetts informed consent cases indicate that materiality requires more than just non-negligibility. The defendant contends that <u>Feeley</u> stands for the proposition that if a plaintiff can show evidence of only a negligible risk, then there is no duty to disclose, because such a risk is, as a matter of law, not material. <u>See</u> <u>id.</u>, 679 N.E.2d at 182 (holding that there was no duty to disclose because plaintiff failed to show "more than a negligible risk").

The district court seemingly adopted the plaintiff's interpretation of the law by stating that "the doctor must inform the patient where there exists more than a negligible risk of one or more serious consequences from the course of treatment that is being undertaken by the doctor." After hearing the evidence, the court found that Dr. Laz was aware of the risk factors for a birth injury and that these risk factors were "something more than negligible." However, the court then weighed the risks to the mother of a C-section, which the court found to be "more than normally associated with the birth of a child," against the risks to the child of a vaginal birth and found "that Dr. Laz was under no duty to afford [Ms. Taft] the opportunity to have a cesarean section and on the particular circumstances of this case a cesarean section to avoid brachial plexus injury was not a reasonable medical judgment."

-11-

We believe that the district court erred in its interpretation of Massachusetts law, thereby triggering de novo review of its finding that Dr. Laz owed no duty to disclose the risks and alternative methods of childbirth. See 15 Bosworth St., 236 F.3d at 54; Vinick, 205 F.3d at 6-7. As discussed above, Harnish and Precourt establish materiality as the standard for determining whether a physician has an affirmative duty to disclose. See Harnish, 439 N.E.2d at 243 (noting duty to disclose material information, but that this does not require the disclosure of all risks); Precourt, 481 N.E.2d at 1148-49 (recognizing duty to disclose material information, which does not include "remote risks"). However, Precourt reserved the issue of how to determine when a risk need not be disclosed, except for indicating there is no duty to disclose negligible risks:

> The development of our law concerning the distinction between risks that as a matter of law may be considered remote, and those that may be left to the determination of a fact finder, must await future cases. It is clear, however, that when, as in this case, the evidence does not permit the jury to draw an inference that the physician knew or reasonably should have known that the probability that a particular risk would materialize was other than negligible, the evidence is insufficient to warrant a finding that the physician violated his duty of disclosure.

481 N.E.2d at 1149-50.

Feeley did not change this materiality approach to informed consent. In Feeley, a mother sued for medical malpractice when her child died from streptococcus pneumonia five days after birth. See 679 N.E.2d at 181. The mother alleged that the

-12-

treating physician, who opted for spontaneous labor (as opposed to inducing labor) after her water broke, failed to disclose any risk of infection from this procedure. See id. The Supreme Judicial Court of Massachusetts, citing Harnish and Precourt, undertook a materiality analysis and concluded that "[t]he evidence would not permit a finding that the risk to the child of serious infection was more than negligible." 679 N.E.2d at 181. Thus, because the severity of the potential injury was minimal, the court concluded that the information was not material, and the doctor, therefore, had no duty to disclose. See id. at 181-82.

The plaintiffs in Feeley, similar to the plaintiff in this case, argued that there was more than a negligible risk and, as a result, that risk had to be disclosed. See id. On the particular facts, however, the Feeley court determined that the risk was not more than negligible. See id. at 182. Thus, the court stated that "[t]he risk that must exist in order to invoke informed consent principles in this case is a more than negligible risk of one or more infections that will have serious consequences." Id. This context clarifies that the court was merely negating any duty to disclose negligible risks. The court was not, as plaintiff argues, declaring an affirmative duty to disclose any risk that is "more than negligible." Thus, the caselaw stands for the proposition that there is no duty to disclose negligible risks, not that all non-negligible risks are actionable if not revealed.

As a result, when the district court's analysis focused on whether the risks were "more than negligible" rather than on materiality, the district court applied the incorrect legal standard. Thus, we vacate the district court's judgment and remand the case to the district court judge to assess the materiality of the risks of vaginal birth to a reasonable person in Ms. Taft's position.[6]

Moreover, the court made a second legal error by balancing the risks to the child from a vaginal birth against the risks to the mother from a C-section and concluding that, because the C-section presented a greater risk and was therefore not medically recommended, the doctor had no duty to disclose the risks of either procedure. The materiality standard for disclosure does not incorporate a balancing test by which the court can weigh the risks of alternate treatments in deciding what information is material to the patient. An obstetrician in the delivery room is in the unique situation of having to take into account the best interests of two individuals, mother and child, in rendering medical care. Cf. Thomas v. Ellis, 106 N.E.2d 687, 689-90 (Mass. 1952) (holding that evidence could support finding of negligence where doctor's external turning of fetus' position, causing a

---

[6] Materiality, since it is a factual determination, is properly left for the district court to determine. See Kissinger v. Lofgren, 836 F.2d 678, 681 (1st Cir. 1988) (finding that once jury had heard evidence on likelihood and severity of injury, it was jury's responsibility to determine materiality); Harnish, 439 N.E.2d at 243; Canterbury, 464 F.2d at 787, 788, 794; McMahon v. Finlayson, 632 N.E.2d 410, 413 (Mass. App. Ct. 1994) (stating that materiality is issue for the fact finder once there has been expert testimony regarding the likelihood of the injury).

separated placenta, endangered health of both mother and child). As such, in recommending a course of treatment to his patients, the standard of care may require the doctor to consider the risks to the mother, the risks to the child, and the appropriate balance of these risks.

However, the standard of care that governs a conventional medical malpractice case differs from the materiality standard that governs informed consent cases. See Steinhilber v. McCarthy, 26 F. Supp. 2d 265, 272, 274-75 (D. Mass. 1998) (analyzing doctor's negligence under the standard of care of an average member of his profession but his duty to disclose under materiality of the information). Under informed consent law, if a risk to the baby or a risk to the mother is material to the patient-mother's decision, the doctor has a duty to disclose that risk. See Harnish, 439 N.E.2d at 243 (asserting that physician has duty to disclose "all significant information that the physician possesses" that is material to the patient's decision). Once these risks and other material information have been disclosed, it is the patient's prerogative to balance these risks and choose the form of treatment that best meets that patient's needs. See Harnish, 439 N.E.2d at 244 (declaring it is "the patient's right to decide for himself"); Canterbury, 464 F.2d at 781 ("To the physician, whose training enables a self-satisfying evaluation, the answer may seem clear, but it is the prerogative of the patient, not the physician, to

-15-

determine for himself the direction in which his interests seem to lie.").[7]

Thus, if, on remand, the district court finds that a risk existed either as to the mother's health <u>or</u> as to the child's health and that such information would have been material to a reasonable patient in Ms. Taft's position, then Dr. Laz had a duty to disclose that risk. Moreover, because there are only two methods of childbirth, if the district court finds the risk of vaginal birth to be material to the patient, then Dr. Laz also had a duty to present the alternative option of a C-section that might minimize such risk, regardless of his medical opinion on the proper course of treatment.[8]

---

[7] The patient's opportunity to perform this balancing may assume particular importance when the patient is a mother giving birth. In such a case, the mother may purposefully discount risks to herself in order to choose a treatment or procedure that will present the least risk to her newborn child. While the treating physician will undoubtedly feel the need to balance the welfare of mother and child, the mother may consider her baby's health as the paramount concern. <u>See</u> Statement by American Medical Association on Forced Cesarean Section Court Case in Chicago, U.S. Newswire, December 15, 1993, <u>available at</u> 1993 WL 7132850 (opining that in cases where there is a "trade-off" between the health of the mother and the child, "pregnant women routinely choose" and "should" choose a cesarean section "for the benefit of their fetuses," even though the risk to the woman is higher than from a vaginal delivery).

[8] We emphasize that a duty to disclose, if it exists, does <u>not</u> necessarily indicate any duty to offer or to perform a C-section if the doctor does not consider one to be warranted in his medical judgment. <u>See</u> <u>Canterbury</u>, 464 F.2d at 781 (separating physician's duty "to treat [and diagnose] his patient skillfully" from his "obligation to communicate specific information to the patient"). The duty to disclose is intended to be limited, so as not to unduly burden the practice of medicine. <u>See</u> <u>Harnish</u>, 439 N.E.2d at 243.

**IV.**

The plaintiff also challenges on appeal the district court's analysis of his claim for damages arising out of the alleged malpractice. The district court, in an effort to provide a "complete record of factual findings," analyzed the case backwards, starting with an assessment of damages, then proceeding to causation, negligence, and duty, in that order. Although we understand why the court engaged in this method of analysis, rather than simply concluding its ruling after finding there was no duty to disclose, such analysis resulted in extraneous factual findings. Therefore, because the district court did not need to reach the issue of damages, any findings regarding damages are dicta; the district court did not actually award any damages. As a result, plaintiff's claims of error in computing the damages are premature. See United States v. Ottati & Goss, Inc., 900 F.2d 429, 443 (1st Cir. 1990) (refusing to address appeal of district court's liability finding since such finding was not necessary to the judgment below). Rather, plaintiff should raise his claims if, on remand, the district court finds Dr. Laz liable and awards damages.

**V.**

For the reasons discussed herein, we vacate the district court's judgment and remand the case to the district court judge for a determination of materiality.

**Vacated and remanded for actions consistent with this opinion.**