Melvin D. HARRISON, Jr.; PPA Kenyeda Taft, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. CIV.A.99–10407–WGY.

United States District Court, D. Massachusetts.

Nov. 12, 2002.

William J. Thompson, Adam R. Satin, Lubin & Meyer, Boston, MA, for Plaintiff.

Mary Elizabeth Carmody, United States Attorney's Office, Worcester, MA, Emily H. Fournier, Davis, Malm & D'Agostine, P.C., J. Yasmin Tayyab, Michael F. Conway, Anderson, Adler, Cohen & Harvey, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

Kenyeda Taft ("Taft") brought suit on behalf of her minor son, Melvin Harrison ("Harrison"). The complaint alleged that Dr. Louis Laz ("Laz"),[1] the attending obstetrician, failed to meet the requisite standard of care in delivering Harrison, and failed to obtain the informed consent of Taft to deliver Harrison vaginally, rather than through a Cesarian section ("C-section"). As a result of these alleged failures, complications during the vaginal delivery resulted in permanent injury to Harrison's brachial plexus, a condition referred to as Erb's Palsy.

After a five-day bench trial, this Court entered judgment for the United States, holding both that the standard of care was not breached and that Laz had obtained the informed consent of Taft to proceed via a vaginal birth. Taft then appealed the Court's judgment on the informed consent claim. On appeal, the First Circuit ruled that this Court applied an incorrect legal standard in assessing Taft's informed consent claim, and set forth the appropriate analytic framework by which to determine whether Laz adequately informed Taft of the various risks associated with vaginal births. *Harrison v. United States*, 284 F.3d 293 (1st Cir.2002). Now properly instructed, this Court must determine whether the information not disclosed to Taft—namely, the comparative risks and advantages of the two methods of childbirth—would have been material to her.

## I. INTRODUCTION

A summary of the relevant factual history is appropriate, as it informs the Court's materiality analysis. For a more detailed statement of the facts, see the First Circuit's decision in *Harrison*, 284 F.3d at 295–97.

This case arises from allegedly negligent obstetric care. In 1996, Taft was pregnant with her second child (Harrison, the plaintiff in this action). *Id.* at 295. During her fourth month of pregnancy, Taft went to the Lynn Community Health Center for normal prenatal care. *Id.* at 296. At this initial visit, during which she met with a nurse practitioner, Taft provided her medical history. *Id.* at 295–96. Of significant importance, she disclosed that her first child, who had weighed 9 pounds and 3 ounces at birth, had developed Erb's Palsy (a permanent condition whereby the nerves that supply the muscles of the arm are injured) as a result of birth complications. *Id.* at 296. Erb's Palsy often results from shoulder dystocia, a birth complication that occurs when the baby's shoulders impede its passage through the birth canal after the head has been delivered. *Id.* It can, however, also occur spontaneously. *Id.*

In her fifth month of pregnancy, Taft met with Laz at the Lynn Community Health Center, at which point she informed him personally that her first child had developed Erb's Palsy as a result of shoulder dystocia. *Id.* Laz obtained the obstetric records of the first birth, which had occurred at Salem Hospital, and examined them. *Id.* The records disclosed no

---

1. Laz is a federal employee; accordingly, the named defendant in this suit is the United States.

indication of shoulder dystocia, from which Laz concluded that the Erb's Palsy affecting Taft's first child had not been caused by shoulder dystocia, but rather had occurred spontaneously. *Id.*

At the time, Laz's general practice in treating pregnant women who had previously given birth to large babies, as Taft had, was to estimate the fetal weight by ultrasound at approximately 37 weeks' gestation. *Id.* If the estimated weight was 4500 grams or more, Dr. Laz would offer the patient an elective C-section. *Id.* If the estimated weight was less than 4500 grams, Dr. Laz would recommend that labor be induced at 37 or 38 weeks' gestation. *Id.*

In addition to the large size of her first child, and the tendency of second children to weigh more than first children, several factors indicated that Taft's baby would be large. *Id.* The fetus was male, and male babies tend to be larger at birth. *Id.* Taft was also obese, and had experienced excessive weight gain during pregnancy, both of which further indicated that the baby would be large. *Id.*

During her seventh or eighth month of pregnancy, Taft asked Laz about the possibility of a C-section, telling him that she seemed to carry large babies, and that she wanted to avoid having the same problem that her first baby had experienced. Trial Transcript Vol. 2 at 137–39. Laz responded that he would perform an ultrasound to see how big the baby was. *Id.* at 138. Thus, at 37 weeks' gestation, Taft went to Union Hospital for an ultrasound. *Harrison*, 284 F.3d at 296. The ultrasound estimated the fetal weight to be 3676 grams (just over 8 pounds). *Id.* Because this was below his 4500 gram threshold, Laz determined that a vaginal delivery was appropriate, and recommended to Taft that labor be induced. *Id.* He did not discuss with her the risks of vaginal delivery. *Id.* Nor did he discuss the alternative of a C-

section. *Id.* In accordance with Dr. Laz's recommendations, Taft went to Beverly Hospital five days later to have her labor induced. *Id.* at 297.

During Taft's delivery of Harrison, shoulder dystocia occurred: the baby's shoulders became stuck in the birth canal. *Id.* Accordingly, Laz had to deliver one arm first. *Id.* On delivery, Harrison weighed 4508 grams, thus slightly exceeding the size threshold at which Laz would have performed a C-section. *Id.* Harrison was born with a weakness of the right arm and hand, which was diagnosed as Erb's Palsy. *Id.*

Taft brought suit on behalf of Harrison. She alleged two causes of action: (1) failure to meet the standard of care by not originally offering a C-section and by not performing a C-section during labor; and (2) failure to obtain informed consent by not disclosing the risks of vaginal birth and the alternative of a C-section. After the bench trial, this Court held that the standard of care had not been breached. That ruling has not been challenged, and stands. The Court also held that Dr. Laz had not failed to obtain Taft's informed consent, because although the risks to the baby of vaginal delivery were "more than negligible," when balanced against the risks to Taft associated with C-section surgery, it was not medically reasonable to perform the C-section. Accordingly, the Court found that Laz was under no duty to inform Taft of the C-section alternative to vaginal delivery.

The Court erred in its second holding. On appeal, the First Circuit reversed this Court on the informed consent claim and remanded the case for consideration of whether the C-section alternative was material to Taft. *Harrison*, 284 F.3d at 301–02. In response, the parties submitted briefs, the Court held oral argument and made several oral supplemental findings and rulings, and the parties then submit-

ted supplemental briefs. This opinion is intended to amplify and clarify the Court's oral findings and rulings. To the extent that this opinion contravenes those findings and rulings, this opinion controls.

## II. DISCUSSION

 Under Massachusetts law, to recover under a theory of informed consent, a plaintiff must show (1) that his doctor had a duty to disclose the information in question, and (2) that the doctor's breach of that duty caused the plaintiff's injury. *Halley v. Birbiglia*, 390 Mass. 540, 548, 458 N.E.2d 710 (1983). The "duty" prong of this analysis comprises four elements. A plaintiff must prove (a) a sufficiently close doctor-patient relationship; (b) that the doctor knew or should have known of the information allegedly not disclosed; (c) that the doctor should reasonably have recognized that this information would be material to the patient; and (d) that the doctor failed to disclose this information. *Id.* The "causation" prong of this analysis then requires a plaintiff to show that the unrevealed risk materialized, and that, had the proper information been provided, neither he nor a reasonable person in similar circumstances would have undergone the procedure (here, vaginal delivery). *Harnish v. Children's Hospital Medical Center*, 387 Mass. 152, 157–158, 439 N.E.2d 240 (1982).

 The Court begins with the duty prong of the analysis—specifically, with an assessment of whether Dr. Laz had a duty to disclose the risks of vaginal birth and to describe the alternative option of a C-section. There is no real dispute that Dr. Laz and Taft had a close doctor-patient relationship, that Dr. Laz knew or should have known of the risks of vaginal birth to Taft,[2] and that Dr. Laz did not disclose those risks. The only dispute relates to

the final element of the duty inquiry: whether vaginal delivery posed a material risk to either Taft or her baby. As the *Harrison* court explained, "if a risk to the baby *or* a risk to the mother is material to the patient-mother's decision, the doctor has a duty to disclose that risk." 284 F.3d at 301 (emphasis in original). This Court therefore erred when it incorporated a balancing test into its analysis and held that because the risks of vaginal delivery to the child were outweighed by the risks of a C-section to the mother, the doctor had no duty to disclose the risks of either procedure. Once a doctor has established that material risks are present, balancing is inappropriate: he must inform the patient of those risks.

 Accordingly, the question here is whether there were in fact material risks to vaginal birth. Under *Harnish*, materiality is defined as follows:

> Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment.... Appropriate information may include the nature of the patient's condition, the nature and probability of the risks involved, the benefits to be reasonably expected, the inability of the physician to predict results, if that is the situation, the irreversibility of the procedure, if that be the case, the likely result of no treatment, and the available alternatives, including their risks and benefits.

*Harnish*, 387 Mass. at 156, 439 N.E.2d 240 (internal citations omitted). In short, this Court must evaluate the level of significance that a reasonable person in Taft's position would have attached to the risks of vaginal delivery.

---

**2.** The government contended in its brief on appeal that this issue was also disputed, but

the First Circuit rejected this argument. *Harrison*, 284 F.3d at 298 n. 3.

As the Court stated at the oral argument of June 25, 2002, it has no hesitation in concluding that the risks of vaginal delivery—namely, the potential for shoulder dystocia and resultant Erb's Palsy in her child—would have been material to Taft as well as to a reasonable pregnant woman in Taft's condition. Erb's Palsy is a permanent condition whereby the nerves that supply the muscles of the arm are injured, usually resulting in complete to partial paralysis to the shoulder, upper arm, elbow, forearm, wrist, hand, or fingers. Although the condition can be mitigated with proper therapy, it is likely to persist for the duration of a victim's life. As a mother of one child with Erb's Palsy, Taft was aware of the serious nature of this condition and had herself asked Dr. Laz about C-sections.

■ Accordingly, Dr. Laz certainly knew or should have known that the risks of vaginal delivery were material to Taft. He therefore should have disclosed those risks, and should have provided information about the alternative option of a C-section. As the *Harrison* court explained, because there are only two methods of childbirth, once there is a material risk to vaginal birth, the doctor's duty to disclose that risk also encompasses the duty to present information about C-sections. *Harrison*, 284 F.3d at 302. In failing to communicate this information, Dr. Laz breached his duty of disclosure.

■ The Court now turns to the causation prong of the informed consent analysis. As noted above, to prevail on an informed consent cause of action, in addition to demonstrating that her doctor breached his duty of disclosure, a plaintiff must also show that the undisclosed risk materialized, and that she—as well as a reasonable person—would have acted on that information had it been disclosed. *Harnish*, 387 Mass. at 158, 439 N.E.2d 240. There is no dispute here that the undisclosed risk of vaginal delivery—shoulder dystocia and resultant Erb's Palsy—actually materialized in this case. Even so, the parties dispute whether Taft would have chosen a C-section had she been informed that it was more risky for her, but would substantially reduce the risk of Erb's Palsy in her child.

This Court finds that Taft would have made this choice. It credits her testimony at trial that she would have opted for a C-section because she "had a daughter born with Erb's Palsy...and I didn't want that to happen to my second child." Trial Transcript Vol. 2 at 107–08. Also relevant is the fact that even without any information about the risks of vaginal delivery and C-sections, Taft was inquiring whether a C-section might make sense. It is reasonable to infer that, had she affirmatively been informed that a C-section would indeed reduce the risk of Erb's Palsy in her child, her desire for a C-section would only have increased.[3]

---

3. The findings in the paragraph above are reasonable inferences drawn from the totality of the record. Candidly, however, I seem in the past year to be having trouble drawing reasonable inferences. *Benham v. Lenox Savings Bank*, 292 F.3d 46 (1st Cir.2002) (I inferred that an employee was discharged because her employer sought to demonstrate his own power by making an example out of her; reversed, no sufficient evidence from which to draw this inference); *Heinrich v. Sweet*, 308 F.3d 48 (1st Cir.2002) (I permitted jury to infer that massive doses of radiation destroying healthy brain tissue hastened the death of patient; reversed, absent medical expert so testifying); *Read Corp. v. Powerscreen of America, Inc.*, 44 Fed. Appx. 502 (Fed.Cir.2002) (I permitted the jury to infer patent infringement by means of the doctrine of equivalents, saying, "if ever there was a doctrine of equivalents case, this is it"; reversed, no sufficient evidence from which to draw this inference). This trend is particularly regrettable because the drawing of reasonable inferences, being

Moreover, the Court finds that such a choice—essentially a subordination of her risks to those of her child—would have been reasonable. Indeed, the *Harrison* court stressed the importance of allowing a mother to balance the risks to herself against the risks to her child. It noted that "the mother may consider her baby's health as the paramount concern," and cited the American Medical Association's statement that "pregnant women routinely choose," and *should* choose, a C-section "for the benefit of their fetuses." 284 F.3d at 301 n. 7.

The government argues, credibly, that Dr. Laz would not have been willing to perform a C-section. Indeed, he was under no legal duty to do so. But this does not break the chain of causation. On the contrary, the First Circuit made clear in *Harrison* that the duty to inform a patient of the existence of an alternate procedure, and the duty to perform that procedure, are entirely distinct. *Harrison*, 284 F.3d at 302 n. 8. As such, a doctor cannot "save" himself from liability for breach of informed consent merely by arguing that, although he failed to inform his patient about an alternate procedure, causation is lacking because he himself would have been unwilling to perform that procedure upon the patient's request. Such a rule would remove all force from the doctor's duty of informed consent. Rather, by disaggregating the duty to *inform* about alternate procedures from the duty to *perform* those procedures, the First Circuit highlighted the very purpose of informed consent: empowerment of the patient. *See, e.g., Harnish*, 387 Mass. at 157, 439 N.E.2d 240 (stating that the purpose of requiring disclosure is "protection of the patient's right to decide for himself").

Once a doctor has informed a patient about alternatives, the patient can then make her own assessment and seek out medical care that is in accordance with her decision.

By failing to inform Taft of the risks of vaginal delivery, and of the relative risks and benefits of a C-section, Dr. Laz deprived Taft of that opportunity. Dr. Laz treated Taft throughout the second half of her pregnancy, and yet he never advised her—even in response to her inquiry about C-sections—that a C-section would reduce the risk of Erb's Palsy. Therefore, during the months leading up to her delivery, Taft did not explore her options for finding a doctor who would be willing to deliver her child via C-section.

The government certainly has not shown that Taft would have been incapable of finding such a doctor. Instead, the government emphasizes that when Taft ultimately did come to Beverly Hospital for her labor to be induced, she never raised the possibility of a C-section with the obstetrician who attended much of her labor, Dr. Emspak. But this argument misses the point: Taft was operating without the information that a C-section would reduce the likelihood of Erb's Palsy. Meanwhile, Dr. Emspak was operating on the understanding that vaginal delivery was the agreed-upon plan between Taft and Dr. Laz.[4] Deposition Transcript of Dolores Emspak, p. 35. Of course, by the time Dr. Laz ultimately arrived at Beverly Hospital to deliver Taft's baby while she was in the throes of labor, he essentially represented her only option, such that his unwillingness to perform a C-section meant that she had no choice but to proceed with a vaginal delivery.[5] After all, Dr. Laz had induced

particularly case-specific, cannot be "learned" in any meaningful sense.

4. Dr. Emspak did testify in her deposition that she, like Laz, believed that vaginal deliv-

ery was the appropriate method for Taft. Deposition Transcript at 60, 73.

5. Indeed, the Court so found on oral argument.

Taft's labor precisely in accordance with his plan to deliver her baby vaginally. This Court does not infer, however, that had Dr. Laz informed Taft about C-sections in advance, she would not have pursued this option, either when she checked into the Beverly Hospital to have her labor induced, or prior to that point. Dr. Laz's actions—or, rather, his inaction—cost Taft that opportunity.

It would make little sense to expand the law of informed consent such that a plaintiff, in addition to demonstrating that she would have chosen an alternate course of treatment, must also delineate the precise plan of action that she would have followed to obtain that treatment in the face of her initial doctor's refusal to perform it. Such a counterfactual inquiry would be potentially infinite, prompting repeated disputes over the relative availabilities and costs of the alternate treatments at the time in question. It is sufficient for a plaintiff to show that she would have chosen that alternate course of treatment—and that such a choice would have been reasonable. Taft has met this burden.

■ Having found that Dr. Laz breached his duty of informed consent, and that this breach caused the injury to Taft's minor child, Harrison, the Court proceeds to an assessment of damages. Here, the Court refers to its findings at the close of the bench trial. When issuing those findings, the Court began with an assessment of Harrison's damages, although it ultimately failed to award those damages due to its finding that Laz had not deviated from the standard of care or breached his duty of informed consent. Now that the Court has concluded that Laz did, in fact, breach his duty of informed consent, it must revisit the issue of damages, and reinstates its original conclusion the appropriate amount of damages for Harrison's injury is $250,000. Any comparative negligence on the part of Harrison's mother, Taft, is irrelevant to an assessment of damages, as Harrison—not Taft—is the plaintiff in this action, and a parent's negligence may not be imputed to her child. Mass. Gen. Laws ch. 231, § 85D.

## III. CONCLUSION

Guided by the teachings of the First Circuit, this Court holds that the information withheld from Taft—regarding the comparative risks of vaginal childbirth and C-sections—was material. It further holds that Laz's failure to disclose this information caused Harrison's injury, because, had Taft been adequately informed that a C-section would reduce her baby's risk of Erb's Palsy, she would have opted for that method of childbirth. Laz is therefore liable for his failure to obtain Taft's informed consent to proceed with a vaginal delivery.

Accordingly, this Court GRANTS the Plaintiff's motion for entry of judgment [Docket no. 80], and renders judgment against the government in the amount of $250,000.

SO ORDERED.